## WEBBER *v.* VIRGINIA.

1. Letters-patent granted by the United States do not exclude from the operation of the tax or license law of a State the tangible property in which the invention or discovery is embodied.

2. A statute of Virginia requires that the agent for the sale of articles manufactured in other States must first obtain a license, for which he is required to pay a specific tax for each county in which he sells or offers to sell them, while the agent for the sale of articles manufactured in that State, if acting for the manufacturer, is not required to obtain a license or pay any license tax. *Held*, that the statute is in conflict with the commerce clause of the Constitution of the United States, and void.

3. Commerce among the States is not free whenever a commodity is, by reason of its foreign growth or manufacture, subjected by State legislation to discriminating regulations or burdens.

4. *Welton* v. *State of Missouri* (91 U. S. 275) and *County of Mobile* v. *Kimball* (102 id. 691) cited and approved.

ERROR to the Supreme Court of Appeals for the State of Virginia.

This case comes before this court on a writ of error to the Supreme Court of Appeals of the State of Virginia, and arose in this way: In May, 1880, the plaintiff in error, J. T. Webber, was indicted in the County Court of Henrico County, in that State, for unlawfully selling and offering for sale in that

county, to its citizens, certain machines known as Singer sewing-machines, which were manufactured out of the State, without having first obtained a license for that purpose from the authorities of the county, or having paid the tax imposed by law for that privilege.

The indictment was founded upon the forty-fifth and forty-sixth sections of the revenue law of the State, which are as follows : —

" 45. Any person who shall sell, or offer for sale, the manufactured articles or machines of other States or Territories, unless he be the owner thereof and taxed as a merchant, or take orders therefor, on commission or otherwise, shall be deemed to be an agent for the sale of manufactured articles of other States and Territories, and shall not act as such without taking out a license therefor. No such person shall, under his license as such, sell or offer to sell such articles through the agency of another; but a separate license shall be required from any agent or employé who may sell or offer to sell such articles for another. For any violation of this section, the person offending shall pay a fine of not less than fifty dollars nor more than one hundred dollars for each offence.

" 46. The specific license tax upon an agent for the sale of any manufactured article or machine of other States or Territories shall be twenty-five dollars ; and this tax shall give to any party licensed under this section the right to sell the same within the county or corporation in which he shall take out his license; and if he shall sell or offer to sell the same in any other of the counties or corporations of this State, he shall pay an additional tax of ten dollars in each of the counties or corporations where he may sell or offer to sell the same. All persons other than resident manufacturers or their agents, selling articles manufactured in this State, shall pay the specific license tax imposed by this section." Acts of Assembly 1875 and 1876, p. 184, c. 162, sects. 45, 46.

To the indictment the accused pleaded " not guilty; " and on the trial it was proved that he had sold and offered to sell sewing-machines in Henrico County, as charged, but that at the time he was acting as agent or employé of the Singer Manufacturing Company, a corporation created under the laws of New Jersey; that this company had a place of business in Richmond, Va., where it was licensed as a resident mer-

chant, for the year beginning May 1, 1880, and had paid the required license tax, and where it kept a stock of machines for sale; that the machines sold by the accused were the property of the company, and were manufactured by it out of the State, and in accordance with specifications of a patent of the United States, granted in 1879, to one W. C. Hicks, and by him transferred to the company. It also appeared that the accused had not taken out a license to sell the machines in Henrico County, and was not himself taxed as a merchant, and had not taken orders for the machines on commission or otherwise.

On the trial his counsel requested the court to instruct the jury, that if they believed the Singer Manufacturing Company had paid for a general merchant's license for the year beginning May 1, 1880, and received such license, or that the machines sold were constructed according to the specifications of the patent held by the company, and that the accused was acting in the sales made only as its employé, he was entitled to a verdict of acquittal. The court refused to give these instructions, and, at the request of the attorney for the Commonwealth, instructed the jury, in substance, that if they believed the accused had, at different times within the year, previous to the indictment, sold or offered to sell in Henrico County to its citizens Singer sewing-machines manufactured beyond the State, and at the time he was neither the manufacturer himself nor the owner of them, and was not taxed as a merchant in the county, and had not taken orders therefor on commission or otherwise, and had not obtained a license to sell the same in the county, and had not paid to the proper officer the tax imposed by law for selling the same in that county, they should find him guilty.

The jury found the accused guilty, and he was sentenced to pay a fine of fifty dollars and costs. On appeal to the Circuit Court of the county this judgment was affirmed, and on further appeal to the Supreme Court of Appeals of the State the judgment of the Circuit Court was affirmed. To review the latter judgment the case is brought here on writ of error.

*Mr. C. V. Meredith* for the plaintiff in error.

*Mr. James G. Field*, Attorney-General of Virginia, *contra.*

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

In the county court where the accused was tried, the only defence presented by his instructions was, that he was acting as the agent of the Singer Manufacturing Company, which had a license from the State as a resident merchant in Richmond to sell the machines, and also held a patent of the United States, authorizing it to manufacture and sell them anywhere in the United States. To this defence the answer is obvious. The license, being limited to the city of Richmond, gave no authority to the company to sell the machines elsewhere, and of course gave none to its agent. Besides, the question as to the extent of the territorial operation of the license depended upon the construction given by the Court of Appeals of the State to the statute, and its decision thereon is not open to review by us. And the right conferred by the patent laws of the United States to inventors to sell their inventions and discoveries does not take the tangible property, in which the invention or discovery may be exhibited or carried into effect, from the operation of the tax and license laws of the State. The combination of different materials so as to produce a new and valuable product or result, or to produce a well-known product or result more rapidly or better than before, which constitutes the invention or discovery, cannot be forbidden by the State, nor can the sale of the article or machine produced be restricted except as the production and sale of other articles, for the manufacture of which no invention or discovery is patented or claimed, may be forbidden or restricted.

The patent for a dynamite powder does not prevent the State from prescribing the conditions of its manufacture, storage, and sale, so as to protect the community from the danger of explosion. A patent for the manufacture and sale of a deadly poison does not lessen the right of the State to control its handling and use. The legislation respecting the articles which the State may adopt after the patents have expired, it may equally adopt during their continuance. It is only the right to the invention or discovery — the incorporeal right — which the State cannot interfere with. Congress never intended that the patent laws should displace the police powers

of the States, meaning by that term those powers by which the health, good order, peace, and general welfare of the community are promoted. Whatever rights are secured to inventors must be enjoyed in subordination to this general authority of the State over all property within its limits.

These views find support in the language of this court in *Patterson* v. *Kentucky*, 97 U. S. 501. There a party was convicted of violating a statute of the State regulating the inspection and gauging of oils and fluids, the product of coal, petroleum, or other bituminous substances. The statute provided that such oils and fluids should be inspected by an authorized officer of the State before being used, sold, or offered for sale, and required the inspector to brand, according to the fact, casks and barrels of the oil with the words "standard oil," or with the words "unsafe for illuminating purposes." It imposed a penalty for selling or offering for sale in the State such oils and fluids as had been condemned. A particular oil, known as the Aurora oil, which had been thus condemned, was sold by the accused. A patent for the oil had been issued by the United States to a party who had assigned it to him, and in defence to the indictment he asserted the right under the patent to sell the oil in any part of the United States, and that no State could, consistently with the Federal Constitution and the laws of Congress, prevent or obstruct its exercise. But the court held this construction of the Constitution and laws to be inadmissible, and that the right was to be exercised in subordination to the general powers which the several States possessed over their purely domestic affairs, whether of internal commerce or police. After some just observations upon the police powers of the State, their extent and object, and a reference to previous decisions, the court said, speaking through Mr. Justice Harlan : " These considerations, gathered from the former decisions of this court, would seem to justify the conclusion that the right which the patentee or his assignee possesses in the property created by the application of a patented discovery, must be enjoyed subject to the complete and salutary power, with which the States have never parted, of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious

conduct of the few. The right of property in the physical substance, which is the fruit of the discovery, is altogether distinct from the right in the discovery itself, just as the property in the instruments or plates by which copies of a map are multiplied is distinct from the copyright of the map itself." And again, the enjoyment of the right in the discovery "may be secured and protected by national authority against all interference; but the use of the tangible property which comes into existence by the application of the discovery is not beyond the control of State legislation simply because the patentee acquires a monopoly in his discovery."

In accordance with the views thus expressed we can find no objection to the legislation of Virginia in requiring a license for the sale of the sewing-machines, by reason of the grant of letters-patent for the invention.

There is, however, an objection to its legislation arising from its discriminating provisions against non-resident merchants and their agents, and this is presented by the instructions given to the jury at the request of the attorney of the Commonwealth.

The forty-fifth section of the revenue law declares that " any person who shall sell or offer for sale the manufactured articles or machines of other States or Territories, unless he be the owner thereof and taxed as a merchant, or take orders therefor, on commission or otherwise, shall be deemed to be an agent " for the sale of those articles, and shall not act as such without taking out a license therefor. A violation of this provision subjects the offender to a fine of not less than fifty dollars nor more than one hundred dollars for each offence.

The forty-sixth section fixes the license tax of the agent for the sale of such articles at twenty-five dollars. The license only gives him a right to sell in the county or corporation for which it is issued. If he sells, or offers to sell, in other counties or corporations, he must pay in each an additional tax of ten dollars. The section then declares that " all persons, other than resident manufacturers or their agents, selling articles manufactured in the State shall pay the specific license tax imposed by this section."

By these sections, read together, we have this result: the agent for the sale of articles manufactured in other States must first obtain a license to sell, for which he is required to pay a specific tax for each county in which he sells or offers to sell them; while the agent for the sale of articles manufactured in the State, if acting for the manufacturer, is not required to obtain a license or pay any license tax. Here there is a clear discrimination in favor of home manufacturers and against the manufacturers of other States. Sales by manufacturers are chiefly effected through agents. A tax upon their agents when thus engaged is, therefore, a tax upon them, and if this is made to depend upon the foreign character of the articles, that is, upon their having been manufactured without the State, it is to that extent a regulation of commerce in the articles between the States. It matters not whether the tax be laid directly upon the articles sold or in the form of licenses for their sale. If by reason of their foreign character the State can impose a tax upon them or upon the person through whom the sales are effected, the amount of the tax will be a matter resting in her discretion. She may place the tax at so high a figure as to exclude the introduction of the foreign article and prevent competition with the home product. It was against legislation of this discriminating kind that the framers of the Constitution intended to guard when they vested in Congress the power to regulate commerce among the several States.

In *Welton v. State of Missouri* we expressed at length our views on the subject, and to our opinion we may refer for their statement. No one questions the general power of the State to require licenses for the various pursuits and occupations conducted within her limits, and to fix their amount as she may choose, and no one on this bench — certainly not the writer of this opinion — would wish to limit or qualify it in any respect, except when its exercise may impinge upon the just authority of the Federal government under the Constitution, or the limitations prescribed by that instrument. But where a power is vested exclusively in that government, and its exercise is essential to the perfect freedom of commercial intercourse between the several States, any interfering action

by them must give way.   This was stipulated in the indissoluble covenant by which we became one people.

In a recent case we had occasion to consider at some length the extent of the commercial power vested in Congress, and how far it is to be deemed exclusive of State authority.   Referring to the great variety of subjects upon which Congress, under that power, can act, we said that " some of them are national in their character, and admit and require uniformity of regulation, affecting alike all the States; others are local, or are mere aids to commerce, and can only be properly regulated by provisions adapted to their special circumstances and localities.   Of the former class may be mentioned all that portion of commerce with foreign countries or between the States which consists in the transportation, purchase, sale, and exchange of commodities.   Here there can, of necessity, be only one system or plan of regulations, and that Congress alone can prescribe.   Its non-action in such cases, with respect to any particular commodity or mode of transportation, is a declaration of its purpose that the commerce in that commodity or by that means of transportation shall be free.   There would otherwise be no security against conflicting regulations of different States, each discriminating in favor of its own products and citizens and against the products and citizens of other States." *County of Mobile* v. *Kimball*, 102 U. S. 691, 697.

Commerce among the States in any commodity can only be free when the commodity is exempted from all discriminating regulations and burdens imposed by local authority by reason of its foreign growth or manufacture.

The judgment of the Supreme Court of Appeals of Virginia must, therefore, be reversed, and the cause remanded to it for further proceedings in accordance with this opinion; and it is

*So ordered.*