# CHARLESTON

## TOWN OF FULTON *v.* NORTEMAN.

Submitted June 29, 1906.. Decided November 20, 1906.

1. MUNICIPAL CORPORATIONS—*Ordinances—Unjust Discrimination.*

To be valid, municipal ordinances must be free from such vices as discrimination against the sale or use of articles of lawful trade, merely on the ground of the place of their production, as well as promotive of the purposes for which the power to pass and enforce them has been delegated by the legislature, or is inherently possessed. (p. 564.)

2. SAME—*Manufacture of Fertilizers—Use of Dead Animals.*

A municipal ordinance, declaring it unlawful for any person to bring into the town, the authorities of which passed it, the carcass or dead body (or any portion thereof) of any animal intended for burial, cremation or manufacture into fertilizer of any kind, and for any person to bury, cremate or manufacture into fertilizer, or cause to be buried, cremated or manufactured into fertilizer, any such carcass, dead body or a portion thereof, so brought in, and for any person to receive such a carcass or dead body within the town, but not prohibiting the bringing in of such carcass or dead bodies for other purposes, nor making it unlawful to manufacture fertilizer in the town from such materials, discriminates against valuable articles used in lawful 'trade and business, on the ground of location with reference to municipal lines, in so far as it forbids importation thereof for the purpose of manufacture into fertilizer, and is, therefore, void to the extent aforesaid, although, but for such discrimination, it might be valid as an ordinance promotive or protective of health and restrictive of an injurious and offensive transaction, pursuit or business. (p 576.)

Appeal from Circuit Court, Ohio County.

Action by the town of Fulton against William Norteman. Judgment for plaintiff, and defendant brings error.

*Reversed.*

CALDWELL & CALDWELL and DOVENER & FICKEISEN, for plaintiff in error.

JAMES W. EWING, for defendant in error.

POFFENBARGER, JUDGE:

The question presented by this record is whether or not an ordinance passed by the town of Fulton is valid. William

Norteman was convicted in the criminal court of Ohio county, on a charge of having violated it. The circuit court of that county affirmed the judgment on a writ of error. This Court granted a writ of error to the two judgments aforesaid.

The material sections of the ordinance read as follows:

"Section 1. It shall be unlawful for any person to bring into the town, the carcass or dead body (or any portion thereof) of any animal intended for burial, cremation or manufacture into fertilizer of any kind.

"Section 2. It shall be unlawful for any person to bury, cremate or manufacture into fertilizer, or to cause to be buried, cremated or manufactured into fertilizer within the said town, any carcass or dead body mentioned in section 1 of this ordinance, or any portion of such body.

"Section 3. It shall be unlawful for any person to receive within the town any carcass or dead body mentioned in section 1 of this ordinance, or any portion of such carcass. In any prosecution under this section, if the delivery of such carcass or portion thereof at any fertilizer plant be proved, it shall be presumed that it was permitted by the owners and operators of such plant and each of them, unless it appear that such person did not know or suspect any such delivery, or that he endeavored to prevent it and gave prompt notice thereof and full information to the mayor before the prosecution."

The material parts of an agreed statement of facts filed in the case read as follows: . "It is further agreed that said defendant, Wm. Norteman did, on the 16th day of May, 1905, in violation of said ordinance, bring into said town portions of a carcass, or carcasses, or dead body or dead bodies of animals, intended for manufacture. It is further agreed that Wm. Norteman, the defendant, was on the day last aforesaid in the employ of The Wheeling Butchers' Association, which association operated on said last named date, and for a long time prior thereto in the town of Fulton, a fertilizer plant; that said association was incorporated under the laws of the State for the purpose of manufacturing fertilizer; that dead bodies of animals were used as necessary ingredients in said fertilizer; that said Norteman brought into said town on said day portions of a carcass, or carcasses, or dead

body or dead bodies of animals to be manufactured into fertilizer in said town by the said Wheeling Butchers' Association, which said dead bodies of animals were necessary for the conduct of said business as aforesaid; and that in order to reach the said plant of the said Butchers' Association it was necessary for said William Norteman to pass into the said town of Fulton. The purpose of this agreed state of facts on appeal to the Criminal Court is to have the validity of said ordinance tested and adjudicated by said court."

The ordinance took effect on the 15th day of May, 1905, and, on the next day, Norteman violated it, and these proceedings immediately followed.

In presenting the case, counsel for the plaintiff in error, discuss, at considerable length, the law relating to the powers of municipal corporations to abate nuisances and the requisites of procedure in the exercise of such power; but the consideration of the validity of this ordinance does not seem to involve extensively legal principles of that kind. The ostensible purpose of the ordinance is not to suppress the business of manufacturing fertilizer in the town, nor does it provide for abatement of the fertilizer plant, which, the agreed statement of facts shows, is in operation in the town. Furthermore, the ordinance is not sufficiently broad, either in the terms used or in the spirit thereof, to prevent or abate, as a nuisance, the transportation of carcasses of dead animals along the streets. It merely inhibits the bringing into town of such carcasses from beyond its limits, and the burial, cremation and manufacture into fertilizer of carcasses brought in from the outside. The most that can be said of it is, that it inhibits the bringing in of such articles for any of the three purposes named, and this inhibition extends to citizens and residents as well as to non-residents. Limited and restrained in its operation to this extent, its object can hardly be said to be the suppression of any business as a nuisance. It might be better described, as regards its object, as an ordinance passed, under the general power, given in the charter, to prevent injury or annoyance to the public or individuals from anything dangerous, offensive or unwholsome, for the purpose of curtailing or limiting a practice which the council deems offensive and unwholsome.

It does not prohibit generally the bringing in of the carcasses of dead animals. They may be hauled through the streets from one side of the town to another and deposited beyond its limits, or brought in for any purpose other than those of burying, cremating and manufacturing them into fertilizer.

Owing to the peculiarity of this ordinance, in respect to the object thereof, as indicated by its terms, the determination of the question presented necessitates a rather extensive inquiry into, and careful consideration of, the legal principles involved. The decisions are uniform to the effect that ordinances must not be oppressive, nor in restraint of trade, nor against common right. They must be impartial and general in operation. A further restriction is, that the vesting in an officer or tribunal of power to act arbitrarily or capriciously, in giving or withholding permission to use property in any lawful manner, or to carry on a business or occupation, is not within the competency of a municipal corporation, although it may have the power of regulating the use of the property or the pursuit of such business or occupation. Smith Municipal Corporations, section 526; 21 Am. & Eng. Ency. Law, 983, 988. Most of these limitations are generally specified by the courts and law writers as mere elements of unreasonableness; but, in the final disposition of most of the cases arising under ordinances which are held to be void, the conclusions are, that the ordinances, in their operation and effect, go entirely beyond mere abuse of discretionary power and violate some legal right, or contravene some principle of public policy. There is, however, a class of cases in which ordinances have been overthrown apparently on the ground of mere abuse of discretionary power. Here it seems to me to be entirely proper to say the ground of the decision is unreasonableness of the ordinance.

Thus, in *Ford* v. *Standard Oil Company*, 32 N. Y. App. Div. 596, an ordinance, relating to the inspection of oil by the sealer of weights and measures, which permitted him to charge for such services of inspection eight and one-third per cent. of the entire value of the oil inspected, and imposed no restrictions upon him and prescribed no rules for the regulation of his conduct, was held to be unreasonable

and oppressive. The power of the city of Auburn to cause oil to be inspected and to charge a fee for the service was undoubted, but the mode of the exercise of that power was such as to amount to an abuse of the discretion vested in the municipality by the statute. It required no more trouble and expense to test a thousand barrels of oil than to test one, but the ordinance made the cost, in the one case, only a few cents, and, in the other, a large amount of money. In *Buffalo* v. *Baking Co.*, 39 N. Y. App. Div. 432, an ordinance providing that all bread baked and sold, or offered for sale, by licensed bakers in the city, should be made into loaves weighing one and one-half pounds, and imposing a penalty for its violation, was held to be an unreasonable exercise of police power and an unwarrantable interference with the rights of individuals engaged in trade. The city authorities had power to regulate the sale of bread, but, in the exercise of that power, they had interfered with the business of manufacturing and selling bread, in respect to a matter which did not in any degree, affect the people injuriously. The ordinance neither corrected nor prevented any evil, real or imaginary, and was in no sense beneficial to the public. Hence, so far as its passage was within the competency of the city council, it amounted to an unreasonable exercise of its powers. For this alone it would have been declared void, but, in the restraint it laid upon trade, it went beyond mere abuse of discretionary power and violated positive law. A strikingly similar ordinance was declared invalid, by the Supreme Court of Illinois in *Frost* v. *Chicago*, 1 Mun. Corp. Cas. 390. It made it unlawful to cover anything containing fruit offered for sale, with any colored netting, or other material, having a tendency to conceal the true color or quality of the fruit. The court said it was unreasonable and oppressive. The Chief Justice, delivering the opinion of the Court, said: "It will be noticed that the provision in question of the ordinance does not make it unlawful to sell decayed or unwholesome fruit, or to practice deception on the public by methods employed in packing or displaying it. From whatever view the ordinance is regarded, it is difficult to see how it can be of any public benefit whatever; and while, ordinarily, that is a question for the municipal legislature, it may be considered by the courts in

determining the question of reasonableness. * * * It was shown, and is a matter of common knowledge, that much fruit is shipped and sold wrapped up in tissue paper and in tinfoil, and in packages and baskets covered with wood, all of which material effectually conceals the 'true color and quality' of the fruit, until removed. It would be as reasonable to prohibit the one as the other. Fruit dealers would be subjected to unjust and oppressive discrimination by the enforcement of such an ordinance."

A great many ordinances have been held invalid because, in their operation, they imposed restraint upon trade. Under the power of regulation for the accomplishment of some necessary purpose, a reasonable restraint of trade is allowable, but, when the exercise of that power is merely officious, not based upon a state of facts from which it can be seen that it works any beneficial results to the community, or protects the citizens from any injury or evil, the restraint is said to be unreasonable. This is noticeable in cases already cited. Another illustration is found in *Kosciusko* v. *Slomberg*, 68 Miss. 469, holding as follows: "In the absence of an epidemic or other circumstances apparently rendering the ordinance necessary for the preservation of the public health, an ordinance of a town is void which declares it unlawful to bring therein or offer for sale secondhand clothing, without first having produced satisfactory proof to the mayor that such clothing did not come from a locality where contagion or infection was prevailing or had prevailed. Such an ordinance is an unjust and unreasonable restraint of trade." Other decisions proceeding upon the same theory, and coming to the like conclusion, might be cited.

An ordinance is against common right when it denies to one citizen or class of citizens, what is permitted to others, or imposes burdens upon one person or class of persons, to which others similarly situated are not subjected. Such ordinances generally relate to the exercise of trade, pursuit of vocations and callings, or the use of property. In such cases, it is plain that the vice of the ordinance is not unreasonableness, but want of legislative power. It is unconstitutional. It denies to the citizen the equal protection of the laws. Thus, in *County of Los Angeles* v. *Cemetery Asso-*

*ciation*, 124 Cal, 344, it is held as follows: "A county ordinance making it unlawful to establish, extend, or enlarge any cemetery within the limits of the county, without first obtaining permission of the supervisors, but impliedly permitting burials in cemeteries already established, without restriction, is both unreasonable in making the right to pursue a lawful avocation depend upon the arbitrary will of the supervisors, and unequal in its operation, in assuming to limit the unrestricted privilege of burial to one class of citizens, and to deny it to another class within the same district, or to make the latter subject to the arbitrary will of the supervisors to grant or to refuse that privilege. Such ordinance is invalid, and cannot be enforced by the county." In *Yick Wo* v. *Hopkins* and *Wo Lee* v. *Hopkins*, 118 U. S. 356, the Supreme Court of the United States made the following declaration of principles: "A municipal ordinance to regulate the carrying on of public laundries within the limits of the municipality violates the provisions of the Constitution of the United States, if it confers upon the municipal authorities arbitrary power, at their own will, and without regard to discretion in the legal sense of the term, to give or withhold consent as to persons or places, without regard to the competency of the persons applying, or the propriety of the place selected, for the carrying on of the business. An administration of a municipal ordinance for the carrying on of a lawful business within the corporate limits violates the provisions of the Constitution of the United States, if it makes arbitrary and unjust discriminations, founded on differences of race, between persons otherwise in similar circumstances." In these cases the ordinance itself did not prescribe certain persons or classes of persons, by name, but did the almost equivalent thing of conferring upon officers the power to do so, and the court held such power could not be exercised. The acts of the officers, under the ordinance, were regarded as the acts of the municipal authorities, and hence the ordinance itself was declared to be vicious and unconstitutional; just as in *Ex Parte Virginia*, 100 U. S. 339, the same court declared that, "Whoever, by virtue of his public position under a state government, deprives another of life, liberty, or property without due process of law, or denies or takes away the equal protection of

the laws, violates that inhibition; and as he acts in the name of and for the state and is clothed with her power, his act is her act." In such cases, invalidity seems clearly to be referable, not to unreasonableness in the ordinance, but to lack of municipal power.

Often statutes have been held unconstitutional and void because discriminative and in derogation of common right. Thus, in *Wally's Heirs* v. *Kennedy*, 2 Yerg. (Tenn.) 554, it is held that every partial or private law which directly professes to destroy or affect individual rights, or to afford remedies which lead to similar consequences, is unconstitutional and void. See also *Officer* v. *Young*, 5 Yerg. 320; *Jones's Heirs* v. *Perry*, 10 Yerg, 59; *Budd* v. *The ·State*, 3 Hum. 483. The principles declared in the foregoing cases were held by the same court to be applicable upon the inquiry as to the validity of an ordinance, passed by a municipal corporation which resulted in the following conclusion: "The municipal authorities of the city of Nashville have no power under their charter to discriminate in taxing privileges between merchants and manufacturers and other dealers residing without the limits of the city and members of the same class residing in the city. Such discrimination or special taxation of one class of persons would be beyond the authority of either State or municipal legislation." *Nashville* v. *Althrop*, 45 Tenn. 554.

Ordinances against common right might, in many instances, be overthrown, upon grounds other than that of adverseness to common right. Thus, in *Sayre Borough* v. *Phillips*, 148 Pa. 482, an ordinance of the borough of Sayre which prohibited all persons from engaging in the business of peddling, the selling of goods from house to house, by sample or otherwise, without a borough license, and fix the price of such license at a figure evidently intended to be prohibitive, but, by proviso, exempted all residents of the borough from the operation of the ordinance, was held invalid. Mr. Justice Williams, in discussing the ordinance in the light of legal principles, said: "It professes to prohibit all persons from engaging in the business of peddling or selling goods from house to house, by sample or otherwise, without a borough license, and it fixes the price at a figure that makes, as it was evidently intended to make, the ordinace amount

to prohibition.   So long, however, as it bears upon all persons impartially, it may fairly claim to be a police regulation intended to destroy a business that was regarded as injurious; but at the end of the prohibitive section of the ordinance a proviso may be found which exempts all residents of the borough of Sayre from its operation.   The proviso converts the police regulation into trade regulation.   The ordinance, taken as a whole, does not prohibit an injurious business, but injurious competition.   That the resident dealer and peddler may enjoy a larger trade, the non-resident peddler is shut out.   If the borough authorities may lawfully regulate the business of peddling for the benefit of residents, we see no reason why they may not lay their hands in like manner on every department of trade and of professional labor, and protect the village lawyer and doctor as well as the village grocer and peddler."   To the same effect is *Shamokin Borough* v. *Flanigan*, 156 Pa. 43.   In federal law, this would be municipal legislation on a subject of exclusive federal control.   In State law, it is municipal legislation, respecting a subject concerning which power is rarely, if ever, delegated to municipal corporations, namely, regulation of trade among citizens of the State.

The limitation upon the powers of states and municipal corporations to discriminate between persons are perhaps no more rigid than that upon their powers to discriminate between products of different sections, or property situated on opposite sides of municipal lines.   In *Greensboro* v. *Ehrenreich*, 80 Ala. 579, the court held as follows: "Power conferred on a municipal corporation, by its charter, 'to pass and enforce all ordinances deemed necessary or proper to prevent the introduction of infectious or contagious diseases, and to preserve the health of the inhabitants,' does not confer authority to enact an ordinance making it unlawful for any person 'to import, sell, or otherwise deal in second-hand or cast-off garments, blankets, bedding or bed-cloths,' with a proviso excepting the sale of such articles, when not imported, or which have not been used by persons having infectious diseases."   In *Webber* v. *Virginia*, 103 U. S. 344, the Supreme Court of the United States held as follows: "A statute of Virginia requires that the agent for the sale of articles manufactured in other States must first obtain a license, for

which he is required to pay a specific tax for each county in which he sells or offers to sell them, while the agent for the sale of articles manufactured in that State, if acting for the manufacturer, is not required to obtain a license or pay any license tax. *Held*, that the statute is in conflict with the commerce clause of the Constitution of the United States, and void. Commerce among the States is not free whenever a commodity is, by reason of its foreign growth or manufacture, subjected by State legislation to discriminating regulations or burdens." Mr. Justice Field, in delivering the opinion, said: "The agent for the sale of articles manufactured in other States must first obtain a license to sell, for which he is required to pay a specific tax for each county in which he sells or offers to sell them; while the agent for the sale of articles manufactured in the state, if acting for the manufacturer, is not required to obtain a license or pay any license tax. Here there is a clear discrimination in favor of home manufacturers and against the manufacturers of other states. Sales by manufacturers are chiefly effected through agents. A Tax upon their agent when thus engaged is, therefore, a tax upon them, and if this is made to depend upon the foreign character of the articles, that is, upon their having been manufactured without the State, it is to that extent a regulation of commerce in the articles between the States." Though in this case we have nothing to do with interstate commerce, the reason of this decision, and numerous others to the same effect, is applicable. It is the policy of intra-state law, as well as of federal interstate law, that all citizens shall have the same privilege in respect to trade and occupation. Counties, towns and cities cannot, consistently with the spirit of our laws, arbitrarily erect barriers against one another in the form of ordinances, discriminating between the products of sections, respecting the privileges of sale, or between the citizens of different sections respecting their vocations.

Courts condemn ordinances on the ground of discrimination and partiality, respecting persons, institutions and properties within the boundaries of the corporations, passing them, as readily as those which discriminate against the non-residents and institutions, in favor of residents. In *Crowley*

v. *West*, 3 Mun. Cor. Cas. 153, an ordinance, the effect of which was to permit four livery stables to be maintained in the business center of the town, while the fifth stable, and all which might thereafter be established, were to be relegated and confined to a designated locality, remote from such center, was declared void and unenforcible by the Supreme Court of Louisiana.

Nor does it make any difference, as the case just referred to and others show, that the institution, business or calling, with respect to which an ordinance is discriminative, is one within the control of the authorities, as regards its location or conduct, under the law relating to nuisances or promotion of health and comfort. Livery stables are of this class. Though not regarded as nuisances *per se*, conditions, surroundings and mode of conduct may make them nuisances. As a means of protecting health and suppressing fraud and imposition in trade, an ordinance may, no doubt, establish and enforce regulaitons, concerning the packing and display for sale of fruits and other food products as is intimated in *Frost* v. *Chicago*, cited, but it must deal with the subject comprehensively, and must not, under the guise or pretense of doing so, strike down one practice which, in all material respects, is like others not forbidden. The element of discrimination makes it unjust and oppressive as well as unreasonable. It is intolerable in any sort of legislation, however ample the authority of the legislative body to deal fairly with the subject matter. There are some apparent, but no real, exceptions, as where classifications are made, for certain purposes, because of material dissimilarity in character, conditions or circumstances.

In determining whether an ordinance is violative of any of the principles hereinbefore adverted to, it is always permissible, and sometimes necessary, to view it in connection with the conditions under which it is intended to, and must, operate. In other words, the facts are to be considered as well as the terms of the ordinance. In *Henderson* v. *Mayor* and *Commissioners of Immigration* v. *North German Lloyd*, 92 U. S. 259, it was declared that: "In whatever language a statute may be framed, its purpose and its constitutional validity must be determined by its natural and

reasonable effect.   Hence a statute which imposes a bur-
densome and almost impossible condition on the ship-master
as a prerequisite to his landing his passengers, with an alter-
native payment of a small sum of money for each one of
them, is a tax on the ship owner for the right to land such
passengers, and, in effect, on the passenger himself, since the
ship-master makes him pay it in advance as part of his
fare." In the case immediately following the opinion in
those cases, namely, *Chy Lung* v. *Freeman*, Mr. Justice
Miller said: "If, as we have endeavored to show, in the
opinion in the preceding cases, we are at liberty to look at
the effect of a statute for the test of its constitutionality, the
argument need go no further." Having said this he pro-
ceeded to consider all the surrounding facts and circum-
stances, as well as the results of the execution of the law.
In *People* v. *Armstrong*, 73 Mich. 288, the following is held:
"Reasonableness or unreasonableness of city ordinance is not
determined by enormity of some offense which it seeks to
prevent and punish, but by its actual operation in all cases
that may be brought thereunder." In the opinion in that
case, the court considered all the probable and possible in-
stances of oppression, and wanton interference with lawful
business and conduct, that might arise under its operation,
taking judicial cognizance of a great many matters of com-
mon knowledge, no mention of which was made in the plead-
ing and evidence. The same thing was done in *Anderson* v.
*Wellington*, 40 Kan. 173. In *Evison* v. *Railway Co.*, 45
Minn. 370, Mitchell, J., delivering the opinion of the court,
said: "It is self-evident that a limitation of the rate of
speed might be reasonable in the thickly-populated and
crowded portions of a city, where continuous buildings ob-
struct the view of approaching trains, and where the noise
and bustle of travel and business are apt to prevent people
from hearing the approach of a train, which would be wholly
unnecessary and unreasonable in the large tracts of sparsely
populated territory of a merely rural character, now so often
included within the corporate limits of cities." In *Wygant*
v. *McLauchlan*, 7 Mun. Cor. Cas. 420, 64 Pac. Rep. 867, the
Supreme Court of Oregon, said: "Now, it is an admitted
fact that there are considerable tracts of land, comprised
within the limits of the city, which are sparsely inhabited.

As was said by the court below, 'there are within the cor-
porate limits of the city of Portland several large tracts of
land, which are used solely for farming purposes, some of
them containing several hundred acres, and on some of them
interments could be made which would be distant a
half mile or more from any human inhabitant or public thor-
oughfare.' Under these conditions, it is assuredly not a rea-
sonable regulation, as a police provision, or for the conserva-
tion of the health or good order of the community, to exclude
burials from the whole territory, save the districts enumer-
ated by the ordinance.''

It is further to be observed, on a view of the decisions to
which reference has been made, that, in almost every case of
condemnation for unreasonableness, restraint of trade, ad-
verseness to common right, discrimination or want of au-
thority, an apparent ground of authority and color of legality
has been discoverable in the terms of the ordinance. But it
is not enough that an ordinance is, in some sense or degree,
promotive of the purpose for which the power to pass it was
given. It must also be free from those elements which the
courts have declared to be vicious in legal contemplation. In
endeavoring to promote health, preserve order, encourage
trade, and abate nuisances, corporate authorities must avoid
discrimination, oppression, excess of authority and other
things which are forbidden to them. An ordinance, to be
valid, must be within the corporate power, promotive of
the purpose for which the power was delegated, or is in-
herently possessed, and free from the vices of unrea-
sonableness, partiality, arbitrariness and unconstitutional-
ity. Whether it combines all these requisites is to be
determined by its operation and effect, whatever the os-
tensible purpose or effect, disclosed by its mere letter, may
be.

The ordinance under which this conviction was obtained,
on its face, bears some relation to the subjects of protection
to health and immunity from injury, annoyance and offen-
siveness; but its effect is limited to three subjects, burial of
carcasses, cremation thereof and manufacture thereof into
fertilizer. These must be regarded as its primary objects.
The bringing in of carcasses for such purposes is a mere
preliminary incident of their burial, cremation or manufac-

ture into fertilizer.   Bringing them in for other purposes is
not inhibited.   Prevention of the conveyance thereof along
the streets and consequent noxiousness of the air and offen-
siveness to sight and smell, is not, therefore the main pur-
pose.   Both residents and non-residents having slaughter
houses and butcher shops within the town are at liberty, not
only to convey their offal along any street thereof, but also
to cremate or convert the same into fertilizer.   For aught
that appears here, all the slaughter houses and butcher shops
of the neighboring city of Wheeling might be removed into
Fulton, and the output of fertilizer from the plant immensely
increased and the streets more heavily burdened with the of-
fensive materials.   Or, by removing their plant beyond the
corporate line, all the offal from Wheeling might pass
through the streets of Fulton, without violation of this
ordinance.   While thus operating almost solely and directly
upon the manufacture of fertilizer from these materials, that
business is not forbidden.   It remains a lawful business in
the town, a source of profit and means of livelihood to resi-
dents and non-residents who care to engage in it.   Foul, nau-
seating and unwholesome though it is, the offal from slaugh-
ter-houses and butcher-shops, by reason of the power to con-
vert it into fertilizer, is valuable to its owners.   Passing
through the industrial plant and the marts of trade, yielding
wages to labor and profit to capital, it becomes a power in
the realms of agriculture and horticulture.   Though it is
such an article, as, like the livery stable, hog-pen and many
other useful concerns, may be subject to municipal control,
under the police power, it is an article, known to commerce
and industry as a thing of value, in which all persons have
an equal right to deal and trade, which cannot be denied
the privilege of a lawful market therefor on account of the
locality of its production, and the owner of which cannot
be cut off from such privileges because of his place of habi-
tation, he being a citizen of the state or nation or a foreign
country whose citizens or subjects have, by treaty stipula-
tion, the rights and privileges of citizens of this country, re-
specting industry and trade.   Municipal corporations can no
more discriminate against it, on account of the place of its pro-
duction, than they can against second-hand clothing merely
because it comes from beyond the corporate limits or be-

tween  resident and non-resident peddlers, or between  livery stables within the town.  So long as the manufacture of fertilizer is recognized and permitted by the authorities of Fulton, as a lawful business, affording a market for offal, or a place in which it is lawful to convert it into fertilizer, the privileges of the market or industry must be equally open to materials used therein without regard to the place of their production.  To hold otherwise would be to ignore the legal principles adverted to in this opinion.  The fact that it is, in some degree, protective of health and diminutive of offensiveness cannot save it.  If it were free from the vices imputed to it, this might bring it within the power of the corporate authorities.  But there are two requisites to its validity.  It must be promotive of the purpose for which the power is delegated or inherently possessed, and free from any of those things, the presence of which vitiates an ordinance.  29 Am. & Eng. Ency. Law 986.

For the reasons stated, the ordinance, in so far as it forbids importation of carcasses and dead bodies of animals and portions thereof for manufacture into fertilizer, is void and unenforceable, because discriminative, wanting in generality and violative of law in its denial of equality in respect to privileges of trade and industry.  As to the validity of the inhibition of importation for other purposes, we have no occasion to inquire or decide.  The judgments complained of will be reversed and the plaintiff in error discharged from further prosecution.

*Reversed.*