(82 South. 458)

STATE ex rel. SMITH, Atty. Gen., v. BURLESON, Postmaster General, et al. (3 Div. 405.)

(Supreme Court of Alabama. June 3, 1919.)

TELEGRAPHS AND TELEPHONES &⇒26¾, New, vol. 7A Key-No. Series—UNITED STATES CONTROL—INTRASTATE BUSINESS—INJUNCTION.

Postmaster General of United States given control of telegraph and telephone lines by President's proclamation under joint resolution of Congress of July 16, 1918, will not be enjoined by state from increasing the charges upon intrastate business.

Appeal from Circuit Court, Montgomery County; Leon McCord, Judge.

Bill by the State of Alabama, on the relation of J. Q. Smith, Attorney General, against Albert S. Burleson, as Postmaster General, and others. Interlocutory or temporary injunction refused by circuit court, and application therefor renewed under Code 1907, § 4519, to Supreme Court. From a decree dismissing the bill and dissolving the injunction, complainant appeals. Affirmed.

J. Q. Smith, Atty. Gen., and Horace Wilkinson, Asst. Atty. Gen., for appellant.

T. D. Samford, Dist. Atty., of Opelika,

Steiner, Crum & Weil, of Montgomery, and A. G. & E. D. Smith, of Birmingham, for appellees.

PER CURIAM. The bill of complaint is dismissed and the injunction is dissolved upon the authority of Dakota Cent. Telephone Co. et al. v. State of South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. Ed. 910. The decree of the circuit court in holding that the bill was without equity and in dissolving the injunction is affirmed.

ANDERSON, C. J. (expressing his individual views). While this case is decided upon the authority cited, and which is conclusive upon this court, and an opinion by this court or any member thereof would be superfluous under ordinary circumstances, yet I feel impelled under existing conditions to give expression of my individual views upon the questions involved in this appeal and which are set forth in an opinion heretofore prepared by me upon an interlocutory order prior to the decision of this question by our highest court. A comparison of this opinion with the one in the North Dakota Case, supra, will disclose the same general result and the identical treatment of the questions respectively discussed, except as to the right or authority under which these lines were taken over by the government. My opinion in effect concedes that they could have been taken over under the war emergency powers, but preferred justifying the same under the postal authority reserved to Congress by the Constitution. Our highest court did not hold that they could not have been so taken over, but preferred justifying the resolutions taking over the railroads and wires as a war emergency measure, and which was no doubt the most practical treatment of the question as the railroad and wire cases were treated as companion cases, the railroad case being first decided and as to which the postal clause of the Constitution did not apply, and the resolution with reference to railroads was not involved in my opinion.

As to the right of Congress to make telegraph and telephone lines a part of the postal system there can be no doubt; as to whether or not the resolution and proclamation dealing with same was sufficiently specific to show such an intent in the present case is perhaps debatable, though I have endeavored to demonstrate that such was the result in discussing the assumption, delegation, and exercise of the power as embraced in the resolution and proclamation. My views upon this question have produced considerable comment and discussion, some favorable and some unfavorable, and which is the fate of every new or novel proposition, while the general result of my holding, as well as that of our highest court, was foreshadowed by many judges, courts, and writers as unsound. Therefore, in justice to myself, though it may serve no useful pur-

pose in the instant case, I have decided to publish said opinion, which may be of some slight interest in the future should the occasion arise for a progressive and perhaps necessary expansion of our great postal system:

"The complainant filed a bill in the equity side of the Montgomery circuit court to enjoin the respondents from increasing the charges or tolls upon intrastate business, and sought an interlocutory or temporary injunction which was refused by Hon. W. L. Martin, one of the judges of said court, and the application has been renewed under the authority of section 4519 of the Code of 1907, which provides that such application may be made to any judge of the Supreme Court.

"Telegraph and telephone companies have been regarded as instrumentalities of commerce generally, and the laws regulating interstate and intrastate business have usually been considered as applicable thereto. It would therefore seem that business conducted wholly within the state is subject to the operation of the state statutes, whether conducted under the police power or not; and messages between points in the same state are domestic dispatches and not within the purview of the Constitution, though sent over the lines of a company doing an interstate business. Western Union Tel. Co. v. Texas, 105 U. S. 460 [26 L. Ed. 1067]; Leloup v. Mobile, 127 U. S. 640 [8 Sup. Ct. 1383, 32 L. Ed. 311]; Western Union Co. v. Alabama Board, 132 U. S. 472 [10 Sup. Ct. 161, 33 L. Ed. 409]. It must be observed, however, that this rule obtained when telegraph and telephone lines were operated by companies as commercial instrumentalities and for profit, and in such a manner as to bring them within the control and influence of the interstate clause of the Constitution; but we are now dealing with said lines as a governmental agency, controlled and operated by the government under the direction of the Postmaster General and in connection with our postal system, and presumably as a part of said system for the time being, as the use, nature, and character of same thoroughly harmonize with said system having the same end in view, though the addition of these lines provides quicker and different means, that is, communicative intercourse between our citizens and the accomplishment of the same general result whether of a commercial, social, or governmental nature.

"'In the American colonies a general post office was established on the 26th day of July, 1775, the year before the Declaration of Independence. By that ordinance it was directed that a line of posts be appointed under the direction of the Postmaster General, from Falmouth, now Portland, to Savannah, with as many cross-posts as he should think fit; and he was authorized to appoint as many deputies as to him might seem proper and necessary. Amendments were made to that ordinance from time to time to the 28th day of October, 1782, when it was repealed and a supplemental ordinance was adopted in its place, conferring substantially the same powers on the Postmaster General. Those powers were continued, with certain alterations and additions, until the Constitution of the United States was adopted. In the eighth section of article 1 of

that instrument, it was provided that Congress shall be vested with power to establish post offices and post roads, and this provision has been practically construed since the foundation of the government to authorize not merely the designation of the routes over which the mail shall be carried and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail, and all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents. And the power thus possessed by Congress is not to be limited by confining the words used in the Constitution to any narrow meaning, for it is only one of several enumerated in that article; and under the final one, that involving the means for carrying all the others into execution, Congress is authorized "to make all laws which shall be necessary and proper" for the purpose. Indeed, this power extends to the regulation of the entire postal system of the country.' 21 R. C. L. 730.

"If therefore these lines have been lawfully made an adjunct or part and parcel of our postal system, though only for a short period and primarily as an aid to our national defenses, they are for the time being subject to the exclusive control of Congress, except in so far as certain rights may be left by it to the states, and in the absence of such authority the states have no more right to regulate the rates and charges than they would have to regulate and prescribe the rate of postage on letters or papers between points within the state; and this would be the result whether the adoption of said lines as a part of our postal system should be permanent or temporary, or whether in time of peace or war. So the question is: Have these lines ceased to fall under the influence of the intrastate clause by becoming an integral part of our postal system, so as to give Congress the complete control of same to the exclusion of the states? Section 8 of article 1 gives Congress the power to establish post offices and post roads, and this section has been practically construed since the foundation of the government to in effect give the federal government the absolute control of all matters incidental to the growth and expansion of our great post office department, including every means for the safe and successful accomplishment of the ends for which it was designed. It would not only be reactionary, but a very narrow interpretation, to confine this section of our Constitution to the method and means existing at the time of its adoption of communication between our citizens. It should be liberally construed so as to keep pace with the progress and development of the country, and the sending of a telegraph or telephone message, or conversing over the telephone, is but a quicker method of communication than by letter, and they all have one common purpose and accomplish the same general result; and there can be no doubt but that the telegraph and telephone lines can validly become a part of the postal system, and as such controlled and regulated entirely by Congress.

"Had the joint resolution of Congress of July 16, 1918, expressly made these lines a part of the postal system or authorized the taking over of same by the President for such purpose, there could be little doubt of the right to do so under section 8 of article 1; and, after becoming connected with or a part of the postal system, they would be subject to the control of Congress and immune from the regulation and control of the states, except as to taxation and police regulation which is, by the resolution, reserved unto the states. While the resolution does not specify the authority under which these lines are to be taken over by the President, or that they must be controlled and operated in connection with or for postal purposes, yet the authority under which the resolution could be justified should be ascribed to it when it appears that the lines are taken over and used for the purpose and in the manner as warranted by the Constitution. In other words, while the resolution did not recite the authority under which it was passed or so specify the use to which the lines were to be put as to make it fall expressly under the influence of section 8 of article 1, still, if the President, under the joint authority given by the resolution, directed the said lines to such purpose and use as is within the sanction of the Constitution, his act in doing so, as well as the resolution, must, to this extent, be approved and upheld. The proclamation of the President under the resolution in question, assuming charge and control of the telegraph and telephone lines and directing Postmaster General Burleson to assume the direction and control of same, does not specifically set forth that they shall become a part of the postal system; yet the wisdom displayed in placing them under the head of the post office department indicates a realization by him that they are so akin to the postal system that they should be operated in connection therewith and as a part thereof, and, being so controlled and operated, the act of so doing is fully warranted by section 8 of article 1. While the resolution is perhaps broader than the proclamation, and while neither specifically makes these lines a part of the postal system, the fact that the President has placed them in that department and under the management and control of said department would indicate that they are used in connection therewith and as an aid thereto; and, so long as they are so used under the authority of the resolution of Congress and the proclamation of the President pursuant thereto, they are not subject to the control and regulation of the states, except in so far as is authorized by the said resolution. It is manifest that Congress, in dealing with telegraph and telephone lines, recognized that they could be so utilized as to remove them from the influence of the interstate clause or the rights of the states to control and regulate, for in dealing with them in the present instance provision was made only for taxation and police regulation by the states; while, in dealing with railroads, it was evidently realized that they were so inherently different that they could not be well excluded from state control and regulation, and much greater power was left with the states as to them. While, as above set forth, the resolution and proclamation did not specify that these lines were to become a part of the postal system, the proclamation does in fact make them a part of same, and as such they fall within the influence of section 8 of article 1. If greater power was granted than the Constitution authorized, but only so much thereof is

exercised as was authorized, the action would be legal and the resolution would to that extent be upheld.

"The contention that the resolution forbids the delegation of the direction and control of these lines to the Postmaster General, but contemplates that the same shall be exercised by the President personally, is without merit. Congress well knew that the President, engaged at the time with world-wide problems of a most serious and far-reaching character, to say nothing of grave matters of an internal character, could not give these lines his personal direction and supervision, and of course contemplated a delegation by him of this authority to the head of some department, and he happily and properly placed them under the department most harmonious and compatible and as a necessary and proper adjunct thereto. Congress well knew that these duties could only be exercised through some department or board, and gave the President the general authority to accomplish the end. As was said by Chief Justice Marshall in the case of McCullough v. Maryland, 4 Wheat. 316 [4 L. Ed. 579]: 'To employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable.'

"The suggestion that these lines are still operated by the owners or companies, and that the government has a mere special or limited direction or control, is without merit. The resolution authorized the President to take possession and control of said lines, and the proclamation directed the Postmaster General to take possession and control, and which gives the right not only to operate but to fix the rates. Indeed, the bill of complaint avers that the Postmaster General has assumed the possession and control of same, as provided by the resolution; moreover, the resolution provides compensation to the owners for said lines while used by the government, and necessarily excludes the idea that they are to continue to operate same on their own account.

"It is contended, and this contention is supported by certain recent decisions in other jurisdictions, that the police powers of the state include the right to fix or regulate rates upon the intrastate business of interstate public utilities, and that the resolution reserves unto the states the 'lawful police regulations.' Of course, if the resolution, giving the states the right in the exercise of its police regulation, intends to use the term in its broader sense rather than with its ordinary meaning, this would end this controversy, as the power to regulate would be vested in the state by the terms of said resolution. It may also be conceded that, if these lines were not converted into a governmental agency and made a part of the postal system so as to give Congress exclusive control over same, the states could not be deprived of their rights to regulate the intrastate business so long as said regulation did not transcend the bounds of constitutional restriction. This question, however, must depend upon the present status of these lines. If they are not governmental agencies, but are still instruments of commerce and are governed by the interstate clause, Congress could not deprive the states of their right to regulate and control the intrastate feature of same, under proper restrictions; but, if they are governmental agencies and have become a part of the postal system, then Congress has the exclusive control over same, and the states can only exercise such control as Congress may will. These lines having become a part of the postal system under section 8 of article 1, Congress has the complete control of same, and the states can exercise only such power as Congress may authorize. The resolution preserves only the right of the states to taxation or the 'lawful police regulations,' and I think these words are used in the ordinary and not the broadest sense, meaning the right to promote the health, peace, morals, education, and good of the people —'those powers by which the health, good order, morals and general welfare of the country are promoted.' Webber v. Virginia, 103 U. S. 344 [26 L. Ed. 565]; New Orleans Gaslight Co. v. Louisiana Light Co., 115 U. S. 661 [6 Sup. Ct. 252, 29 L. Ed. 516]; Crowley v. Christensen, 137 U. S. 89 [11 Sup. Ct. 13, 34 L. Ed. 620]. It is manifest that the resolution did not intend to use these words in the broad sense of leaving it to the states to regulate and control the rates of these lines while operated by the government on its own account and not as a commercial enterprise strictly. I am aware of the rule that statutes involving the rights of the state should be liberally construed in its favor; but where, as here, the federal government has established an agency authorized by its Constitution and over which the state can have no inherent power or control, and the federal government gratuitously bestows certain powers upon them, the provision of bestowal should not be relaxed or loosely construed in favor of the grantee, but should be so interpreted and in favor of the grantor, the paternal government, as to effectuate the purpose of the legislation and should not make the grant any greater than it is. If these lines have become a part of the postal system, the supreme power and control given the President in respect thereto gives him, or rather the Postmaster General, the right to manage and control the same exclusively, and which carries with it the right to fix the rates, and the right given the state to deal with such governmental agency cannot exceed those intended by the resolution.

"It may be that the denial of the injunction can be justified upon the idea that what has been done was as a war measure and without resort to section 8 of article 1 of the Constitution; but I prefer resting my conclusion upon the rule of reason and right, rather than having to resort to the rule of might. The injunction is accordingly refused this 16th day of April, 1919."