SEA–LAND SERVICES, INC. et als Plaintiffs

v.

The MUNICIPALITY OF SAN JUAN et als Defendants.

Civ. No. 1143–72.

United States District Court, D. Puerto Rico.

Sept. 18, 1980.

534

Jiménez & Fusté, San Juan, P. R., for plaintiffs.

William H. Preston, Jr., Jorge Hernández Pérez and Jorge Souss, San Juan, P. R., for Municipality of San Juan.

Emeterio Maldonado Guzmán, Arecibo, P. R., for Municipality of Arecibo.

Natalio García, Dept. of Justice, San Juan, P. R., for Municipality of Ponce.

## OPINION AND ORDER

PESQUERA, Chief Judge.

In this case, we have been asked to solve two constitutional questions of paramount importance. In the presence of weighty authority to the contrary,[1] we are urged to hold that the commerce[2] and "import—export"[3] clauses of the U.S. Constitution apply to Puerto Rico. On that account, we must ascertain whether the municipal license taxes imposed on plaintiffs by the major coastal municipalities are unconstitutional.

Upon the filing of an amended complaint,[4] defendants moved to dismiss on the ground, *inter alia*, that the Butler Act Amendment to the Puerto Rico Federal Relations Act, 48 U.S.C.A. § 872 prohibited suits in federal court for the purpose of restraining the assessment or collection of local taxes. We held that in the absence of a speedy and efficient remedy under local law,[5] we could entertain this action.[6]

The issues are now submitted for our decision after a hearing where most of the crucial facts were stipulated.

---

1. See *RCA v. Government of the Capital*, 91 PRR 404 (1964).

2. Art. I, § 8, Cl. 3.

3. Art. I, § 10, Cl. 2.

4. The original plaintiffs were several companies allegedly in the business of ocean transportation of goods for hire, to wit: Caribbean Sea-Road Service, Inc., Colón & Villalón, Inc., Port San Juan Towing Company Corp., Gulf Puerto Rico Lines, Inc., Transamerican Trailer Transport and Sea-Land Service, Inc. All of these companies, with the exception of Sea-Land Service, Inc. (Sea-Land) and Gulf Puerto Rico Lines, Inc. (Gulf) have voluntarily moved for dismissal of their causes of action and are not parties to this action at present.

5. See *Sancho v. National City Bank of N.Y.*, 112 F.2d 998 (1 Cir. 1940); *Paul Smith Const. Co. v. Buscaglia*, 140 F.2d 900 (1 Cir. 1944). In our view, the holding of *RCA v. Government of the Capital, supra* (that the Interstate Commerce Clause of the Constitution of the United States did not apply to Puerto Rico) effectively foreclose whatever remedies the plaintiffs could seek in the local courts.

6. Defendants subsequently moved for the convening of a three-judge court under 28 U.S.C. § 2281. Such motion was denied, as we concluded that this suit was in essence one to enjoin municipal ordinances of purely local applicability. See our Order of May 17, 1978. Any bearing of our decision on the challenged laws will likewise be either in their enabling capacity or insofar as they were designed to specifically cover plaintiffs under the tax provisions. In this latter case, they still would not be of "general applicability".

## I

### A

Plaintiff Gulf Puerto Rico Lines, Inc.* is a corporation organized and "commercially domiciled" in Puerto Rico. It had its principal place of business in New Orleans, Louisiana and offices in the municipalities of San Juan, Ponce and Mayaguez until October 15, 1974, when it discontinued its business.

Sea-Land Service, Inc., the parent company of Gulf, is incorporated in Delaware, has its principal place of business in New Jersey and offices throughout the world, including the municipalities of San Juan, Ponce, Mayaguez and Arecibo.[7] Both Sea-Land and Gulf have been at all times pertinent hereto engaged in the business of ocean transportation of goods for hire through the Port of San Juan,[8] among others.

Sea-Land's freight is solicited by an independent freight soliciting agent who works on commissions.[9] The agent is responsible for all advertising, promotion and publishing of vessel sailing schedules and other similar services. Upon solicitation of a container load or freight by the agent, the shipper usually hires a local trucker to pick up an empty container at Sea-Land's terminal for delivery to the shipper's facility.[10] Sea-Land requires compliance with certain minimum standards in order to be entitled to haul company trailers. Such local truckers are related to Sea-Land only through the contracted work described above.

Once the shipper loads the container, the trucker is instructed to redeliver it to plaintiffs' truck terminals at the port of embarkation. Upon receipt, plaintiffs take custody of the container and the contents thereof and then load the container on a ship for carriage to the port of destination.

The bulk of the revenues received by Sea-Land in connection with its activities in Puerto Rico and elsewhere is the freight charge. In addition to freight, Sea-Land charges for the following accessorial services commonly associated with its operations in Puerto Rico:

A—*Documentation*—charge for the preparation of shipping documents by Sea-Land to a particular shipper.

B—*Pick-up*—charge that arises when a shipper requests from Sea-Land the pick-up of the cargo at the shipper's facility. Sea-Land hires a trucker for the local overland transportation and passes the freight charge to the shipper or consignee in the waybill.

C—*Delivery*—similar to pick-up charge, arises when a consignee requests delivery of merchandise.

D—*Consolidation*—upon request of a shipper, Sea-Land will consolidate two or more individual shipments and forward them on one bill of lading to one consignee at one point of delivery; charge for this service includes a profit margin.

E—*Handling*—charge for transfer between rail cars or motor vehicles (stuffing or unstuffing).

F—*Heavy lift*—charge for the use of special equipment when containers are

---

* A wholly-owned subsidiary of plaintiff Sea-Land.

**7.** In October 1974 Sea-Land closed its offices in Ponce, Mayaguez and Arecibo and has kept only its San Juan office open in Puerto Rico.

**8.** Until October 1974, Sea-Land operated all its terminals from facilities it had under lease from the Puerto Rico Ports Authority in San Juan, from the Ponce Ports Authority in Ponce, from the Government of Puerto Rico in Mayaguez and from a Mr. Juan Hernández in Arecibo. After such date, Sea-Land kept only and still operates exclusively the terminal in San Juan. It has never taken ships to Arecibo, Ponce or Mayaguez.

Gulf, until it ceased to do business, operated through Puerto Rico Ports Authority in San Juan and Mayaguez and from Ponce Ports Authority property in that city. Neither Sea-Land nor Gulf used property of the municipalities of San Juan or Mayaguez in their operations.

**9.** All reference to Sea-Land's operating procedure is, unless otherwise noted, applicable to Gulf prior to October 1974, when it ceased operations.

**10.** If the shipper is a new customer who has no contract with a local trucker, plaintiffs may select and recommend from its approved list, a trucker to the shipper.

loaded with weight in excess of twenty-five tons.

G—*Insurance*—service provided upon request by the shipper; charge is according to the cargo.

H—*Transfer charge*—charge for inter-terminal trucking of shipments in transit from the U.S. mainland to the Virgin Islands.

I—*Stevedoring*—charge for cargo handling alongside dock facilities, including pick-up of cargo to and from marshalling areas to warehouses, docks and also loading and unloading of the vessels.

J—*Demurrage*—Rent or penalty charge for the use of plaintiffs' trailers after expiration of contracted time.

Additional charges such as wharfage, bunker sur-charge, "arrimo", landing and others are sometimes reflected in the waybill, although they are but operational costs relayed to a shipper or consignee. Likewise, all of the above charges, with the exception of consolidation and handling, leave no profit to plaintiffs. They represent compensation for the incidental or necessary cost of ocean transportation of goods, and are included in Sea-Land's rate structure on a cost and profit basis.

Sea-Land operates an ocean transportation service [11] in fifty three countries, where it serves approximately one hundred and forty ports. Puerto Rico is connected by ship with all those countries, cargo being continuously in transit to and from the majority of such ports.[12] For such purposes, Sea-Land maintains marine terminals at all such ports, as well as sales offices either by self-employed sales representatives or through contractual arrangements with sales agents.[13]

Terminals located within defendants' geographic demarcations are used for various purposes; they may serve as ports of embarkation for goods shipped from Puerto Rico to a final destination outside the island and are also often operated as ports of arrival for merchandise with final destination in Puerto Rico. Additionally, Sea-Land uses the port of San Juan as a relay station for cargo that moves to and from Latin American countries. Although such cargo passes through and is handled at the San Juan terminal (and in many instances complete freight and accessorial charges are collected in the San Juan office), the only activity related to San Juan is that of relaying the cargo from one ship to another at that terminal as part of the north or southbound trips. In like manner, revenues may be received (due to practical operational or accounting considerations) at Sea-Land's local offices for services wholly provided between foreign ports.

A sale or payment for services provided by plaintiffs may be made at origin, destination, or any other point where Sea-Land has an outlet. The bill of lading may be prepared by the shipper, the consignee, by an independent freight forwarder retained by said parties or by plaintiffs themselves.[14] Due to the nature of plaintiffs' business, their internal operational techniques are employed through divisional organization and a centralized accounting system. This system places no relevancy on the particular office where the waybill was cut or the freight collected. Profitability analysis is made on the basis of trade lines and does not depend on specific geographic locations. Consequently, from a financial and account-

---

11. Plaintiffs sell primarily transportation services; accessorial charges constitute only supplemental revenue. For such transportation service plaintiffs charge a published tariff rate on file with the Federal Maritime Commission which rate also specifies such accessorial service charges.

12. The evidence does not establish the extent and size of Gulf's worldwide operations, but they are admittedly of a much lesser scale.

13. Sea-Land also maintains offices at various interior locations within all the countries served. In the United States, it has approximately thirty five sales offices and fifteen marine terminal facilities engaged in its business of ocean transportation.

14. The freight bill may not only be collected from the shipper, consignee or any person receiving the goods at final destination or elsewhere, but may also be split among these parties.

ing standpoint, revenue percentages of worldwide operations are not ascribed or apportioned to particular Sea-Land's facilities.

### B

On March 28, 1914, the Legislature of Puerto Rico enacted the Municipal License Tax Act of Puerto Rico (hereinafter the "1914 Act"). This Act delegated legislative taxing power to island municipalities so as to levy and collect taxes from persons for the privilege of doing business within their territorial jurisdictions. Plaintiffs' business was not expressly included in the 1914 Act as one upon which the tax could be levied. However, through passage of Section 31 of Law No. 142 on July 21, 1960, the respective municipal assemblies were authorized to include through ordinances or resolutions any industry, business establishment or agency not enumerated in Section 2 of the 1914 Act. Defendant municipalities of San Juan, Ponce, Mayaguez and Arecibo, in the light of said authority, adopted ordinances or resolutions whereby plaintiffs' business was required to pay the tax. The legal situation remained unchanged through the Municipal License Tax Act of 1971,[15] which repealed the 1914 Act.[16]

On July 10, 1974 the Legislature of Puerto Rico passed Law No. 113, also known as the Municipal License Tax Act (hereinafter "the 1974 Act") which in turn repealed the 1971 Act. Although this statute did not specifically list the businesses or industries subject to assessment,[17] it did include within its scheme every person engaged in any type of activity for profit. Accordingly, under the 1914, 1971 and 1974 Acts the taxes, levied on the volume of business within each particular municipality, covered plaintiffs' business either directly or indirectly.

In the 1974 Act, presently in force, the term "volume of business" is defined as follows: [18]

"... the gross income that is received or earned from the rendering of any service, from the sale of any goods or from any other industry or business in the municipality where the main organization carries out its operations or the gross income that is received or earned by the main organization in the municipality where it keeps offices, warehouses,

---

**15.** Act No. 27 of June 12, 1971.

**16.** Said Act stated in Section 2, 21 LPRA 641 and 641a in part as follows:

"641. *Authority to levy license taxes*

The municipal assemblies of all the municipalities of the Commonwealth of Puerto Rico are hereby authorized to levy and collect, under the provisions of Sections 641–642 of this title, on and from every person, firm, association, partnership, corporation or any other form whatsoever of commercial or industrial organization engaged in any of the business or industries hereinafter mentioned, the taxes hereinafter enumerated, at the rates herein prescribed in Sections 641–642m of this title, or at such uniform percentage of rates as said municipal assemblies may prescribe and the proceeds thereof shall be used to meet their budgetary expenses; Provided, that if any municipality shall levy said tax at a rate less than the maximum prescribed herein on any business or industry subject to taxation under Sections 641–642m of this title, a proportional reduction from said maximum rates shall be made for all businesses or industries within said municipality...."

"641a. *Businesses or industries subject to taxation*

The businesses or industries on which the taxes herein prescribed may be levied are the following:

Group A. ...
Group B. ...
Group C. ...

In addition to the establishments, businesses or industries enumerated herein, the municipal assembly is authorized to include and classify within groups A, B, C by ordinance or resolution, any other establishments, businesses or industries not enumerated; Provided that all such establishments, businesses or industries which at the time of effectiveness of this Act shall have been included by ordinance or resolution but are not enumerated herein, shall be subject to the provisions of sections 641–642n of this title."

**17.** Cf. note 16, *ante.*

**18.** Although there are several differences between the Acts of 1914, 1971 and 1974, we have been signaled no major disparity regarding coverage and definition of the term "volume of business". Accordingly, our analysis of these provisions of the 1974 Act is equally apposite to the analogous language of the prior statutes.

branches, . . . or any other kind of industrial or commercial organization to carry out business in its name, without considering its gains or profits." (21 LPRA 651a(6)(A))

Under 21 LPRA 651a(2), the term "person" includes ". . . a corporation . . . which is engaged for profit in the rendering of any service . . . in any municipality of the Commonwealth of Puerto Rico". 21 LPRA 651c in turn provides:

"Every person engaged, for profit, in the rendering of any service, in the sale of goods, in any financial business or in any industry or business in the municipalities of the Commonwealth of Puerto Rico, shall be subject to the payment of a license tax . . . ."

The process of assessment requires that such responsibility be imposed on the taxpayer itself. Thus, Section 10 of the 1974 Act provides in part:

". . . any person subject to the license tax levied hereunder . . . or its authorized agent shall file, under oath, . . . a declaration . . . with the following information: (a) name and domicile of industry or business in which he is engaged; . . . (c) kind of industry or business; (d) volume of business during the preceding accounting year, as provided in section 651f of this title, with a breakdown of the main organizations and offices, the services, sales, financial business, industries or businesses and indicating the municipality where said branch or office may be located; (e) the amount of the license tax to be paid. Provided, that the tax return in the case of every person, except those whose volume of business does not exceed one hundred thousand (100,000) dollars, shall be accompanied with a balance sheet and a statement of profit and loss certified by a Certified Public Accountant." (21 LPRA 651i)

21 LPRA 651f in turn provides:

"The license tax levied by authorization of Sections 651–652y of this title shall be computed by the person subject to the tax by taking as a basis the volume of business during its accounting year immediately preceding the date of the return which accounting year should be the same as the one used by him in preparing and filing his income tax return with the Treasury Department."

Ever since 1971, plaintiffs have been protesting the tax imposed on the ground that it violated Commerce Clause considerations. After the filing of the instant action, defendants advised plaintiffs that continued filing of returns would be required, and failure to so file would be sanctioned with the penalties authorized by law. After a series of meetings with defendants' attorneys, an agreement was reached whereby plaintiffs, although still refusing to pay the taxes, would file the forms required by 21 LPRA 651i. It was accorded that plaintiffs' aggregate northbound gross revenues would be reflected in the returns and constitute their "volume of business" for the time being, regardless of where the sales were made, the services rendered, the freight billed, received or paid. Such total sum would be arbitrarily allocated among the defendant municipalities in accordance with defendants' instructions therefor. In such computation, several accessorial charges would be included, while others would be excluded. In lieu of the balance sheet required by 21 LPRA 651i, Sea-Land filed a statement by a CPA certifying the computation of the gross receipts as shown in its declaration. This alternate procedure was adopted in view of the absence, in both the law and the ordinances, of any directives as to what would constitute "gross receipts" of services performed by plaintiffs within each municipality; it was not intended to reflect plaintiffs' "volume of business" therein,[19] but merely constituted an arrangement whereby plaintiffs would avoid being prosecuted for noncompliance

---

**19.** Plaintiffs contend that such want of an apportionment formula, as evinced by the need to agree upon an arbitrary alternate method during the pendency of this action, is indicative of the constitutional infirmity of the challenged ordinances. See our discussion as to this point, *infra*.

with the filing requirements of the law during the pendency of this action.

## II

### Applicability of the Commerce Clause to Puerto Rico

■ A complete evaluation of plaintiffs' constitutional assault on the taxes herein largely revolves on a prefatory determination of the extent, if any, to which the Interstate Commerce Clause of the U.S. Constitution applies to Puerto Rico.[20]

### A

The oft recalled assertion that "Puerto Rico has a relationship to the United States 'that has no parallel in our history' " *Califano v. Torres*, 435 U.S. 1, 3 n. 4, 98 S.Ct. 906, 907 n. 4, 55 L.Ed.2d 65 (1978), quoting from *Examining Board v. Flores de Otero*, 426 U.S. 572, 596, 91 S.Ct. 2264, 2278, 49 L.Ed.2d 65 (1976)[21] epitomizes eight decades of efforts to judicially construe Puerto Rico's position within the American constitutional framework. Such task had its inception in the so-called "insular cases"[22] during the period of 1901 to 1905 and is still very much espoused in current judicial law. See *Harris v. Santiago Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (Marshall, J. dissenting).

In one of such decisions, *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901), the uniformity requirement of Art. I, S 8 of the U.S. Constitution was held inapplicable to Puerto Rico. Section 3 of the Foraker Act, which required the payment of a percentage of duties upon articles of merchandise imported from foreign countries, was thus held constitutional. In so holding, the Supreme Court advanced various theories designed to determine the applicability of constitutional provisions to the territories. The majority view, propounded by Justice Brown, placed the greater emphasis on congressional sovereignty. With the exception of certain "fundamental" rights, the applicability *vel non* of constitutional provisions to a territory would depend largely on congressional intent.[23]

The next major change in commercial regulation of Puerto Rico came with passage of the "Jones Act" in 1917, 39 Stat. 951. This organic act allowed, inter *alia*, the imposition of taxes by the local legislative assembly for the purposes of the insular and municipal governments, but prohibited export duties or practices that discriminated between articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. Moreover, Section 9 of the Act provided that "the statutory laws of

**20.** See our discussion as to the "Import—Export" Clause, Art. I, § 10, Cl. 2, *infra*.

**21.** Cf. also *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Dorr v. U. S.*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901).

**22.** *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. U. S.*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Dooley v. U. S.*, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901); *Hawaii v. Mankichi*, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Kepner v. U. S.*, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904); *Dorr v. U. S.*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); and *Rassmussen v. U. S.*, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905). During this period, the "Foraker Act", 31 Stat. 77 (1900) was in force as the organic statute setting forth congressional policy in Puerto Rico. Under said

Act, the island was integrated into the U.S. tariff, customs and duties systems, with some exceptions as for coffee imports provided (Cf. S 2). Congressional authority for such regulation clearly stemmed from the Territorial Clause, Art. IV, Section 3, Cl. 2, U.S. Constitution.

**23.** However, a turning point where the constitutional structure was to be fully invested arised when the particular territory was deemed to be "incorporated" as opposed to "non-incorporated". See *Downes*, 182 U.S. at pp. 286–344, 21 S.Ct. at pp. 786–809 (White, J. concurring). Cf. also *Balzac v. Porto Rico*, *supra*. This theory of "territorial incorporation" was further developed by subsequent cases. See generally Fuster, *The Origins of the Doctrine of Territorial Incorporation and its Implications regarding the Power of the Commonwealth of Puerto Rico to Regulate Interstate Commerce*, 43 Rev.Jur. UPR 259 (1974).

the United States not locally inapplicable ... [would] have the same force and effect in Puerto Rico". Finally, Section 38 of the law made the Interstate Commerce Act and amendments thereto expressly inapplicable to the island.[24] These provisions remained in force after passage of Public Law 600, 64 Stat. 319 (1950), known as the Federal Relations Act, 1 LPRA (1950) and became a part thereof. Adoption of the Constitution of the Commonwealth of Puerto Rico did not alter the same.

### B

After adoption of the Constitution of the Commonwealth of Puerto Rico in 1952 there have been no comprehensive U.S. Supreme Court opinions elucidative of the constitutional relationship between Puerto Rico and the United States. The issue of the applicability of the Commerce Clause of the U.S. Constitution to the island is thus enmeshed in a rather deranged corpus of caselaw, often contradictory. Cases such as *Ponce Lighter Co. v. Municipality of Ponce*, 19 PRR 725 (1913) (upholding the constitutionality of a license tax on lighters exclusively dedicated to the unloading of merchandise from interstate commerce) and *Suazo v. Lugo*, 42 PRR 56 (1931) (declaring unconstitutional a local law regulating the sale of foreign coffee in Puerto Rico) either present an implied assumption that the Commerce Clause governs local transactions or apply commerce-clause analysis to a controversy, without fully discussing the constitutional import of such reasoning.

In the latter case's appellate stage,[25] the Court of Appeals for the First Circuit, although affirming the local Supreme Court's decision, fleetingly disregarded said court's commerce clause argument, merely stating that "the commerce clause does not extend to Puerto Rico". 59 F.2d at 390. Such was

the first in a short list of unexpounded dicta on the inapplicability of the federal commerce clause to Puerto Rico. The most relevant of such cases is *Buscaglia v. Ballester*, 162 F.2d 805 (1 Cir. 1947). In *Buscaglia*, a general ad valorem property tax was imposed on merchandise purchased by petitioner in Argentina and which had arrived in San Juan but had not yet been released by U.S. Customs authorities for unloading. The Court, in upholding the constitutionality of the tax, found that the Butler Act amendment to Section 3 of the Jones Act, 44 Stat. 1418 constituted sufficient congressional authority and consent to " 'subject to taxation all imported goods, whether from the United States or foreign countries, when brought into the island in the original package[26] [and] to neutralize the regulatory effect of the customs laws and regulations in so far as they protected articles from local taxation after their arrival.' " 162 F.2d 802, quoting *West India Oil Co. v. Domenech*, 311 U.S. 20, 27, 28, 61 S.Ct. 90, 92, 93, 85 L.Ed. 16 (1940). Thus, Congress, in the exercise of its constitutional power under Art. IV, Section 3, Cl. 2 to " 'make all needful Rules and Regulations' [for the territories] has seen fit to give the insular government power to impose the disputed tax". Id., at 807. This alone would have sufficed to settle the constitutional controversy in *Buscaglia*. The Court, however, had prelusively stated:

"The commerce clause gives Congress plenary power to regulate our foreign and interstate commerce and thus as a necessary consequence it has the secondary effect of a restriction upon the power of the states in the premises. It thus has two aspects, but in neither of them, either as a grant of federal power, or as a necessary consequential limitation upon state power, does it affect Puerto Rico. In its aspects of a grant of power to the

---

24. In 1947 the Jones Act was amended to further state that "the rights, privileges and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a state of the Union and subject to the provisions of paragraph 1 of Section 2 of Article IV of the Constitution of the United States (61 Stat. 770).

25. *Lugo v. Suazo*, 59 F.2d 386 (1 Cir. 1932).

26. As to subsequent developments in the "original package" doctrine, see *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).

federal government it adds nothing to the comprehensive power given to Congress by the Constitution, Art. IV, Section 3, Cl. 2 to legislate with respect to national territory, and it can have no consequential effect of limiting territorial action since Congress already has the power under Article IV, Section 3, Cl. 2, supra, to limit such action to any extent it chooses, even to the extent of annulling local legislation." (162 F.2d at 807)

With similar analysis, the Court rejected the applicability of the constitutional prohibition upon the imposition of duties or imposts on imports.[27]

In 1964, the Supreme Court of Puerto Rico squarely faced the issue of Commerce Clause applicability in *RCA v. Government of the Capital*, 91 PRR 404 (1964). Plaintiffs therein, who were engaged in the business of interstate wireless and radio communication, challenged the municipal license tax here at stake [28] as violative of Art. I, Section 8, Cl. 3 of the U.S. Constitution. The Court, after extensively setting forth the "compact" theory (see 91 PRR at 408–415) went on to state:

"From those evident facts ... it is clear in law that ... the public and governmental powers of the Commonwealth of Puerto Rico within its exclusive authority, the most fundamental of which is to levy tax ... flow from itself and from its own authority and it being exclusive as respects its taxing power, it exercises this power free of any higher authority, subject only to the limitations of its own Constitution and its Bill of Rights, and ... Act No. 600." [29] (91 PRR at 415–416)

After finding that the challenged act was not inconsistent with any of the aforesaid laws, or with federal legislation of local applicability, the Court went on to state:

"Another historical fact is that the constitutional provision which reserves to Congress the power to regulate commerce with foreign nations, between the states and with the Indian tribes, has not only not governed, nor governs by its own force in Puerto Rico, but on the contrary, Congress expressly provided that neither the Interstate Commerce Act and the

27. Cf. 162 F.2d 805, 807. In *Mora v. Torres*, 113 F.Supp. 309 (D.C.P.R.1953) an analogous dictum was based on the "compact" theory. Under the Court's understanding of the U.S.—Puerto Rico relationship, adoption of the Puerto Rican Constitution and passage of the Federal Relations Act had created a bilateral relationship between said parties of which the Interstate Commerce Clause and Fourteenth Amendment formed no part. Although the Fifth Amendment's procedural protections were assertedly comprised in the "compact", all additional provisions of the U.S. Constitution excluded therefrom could not be applied to the island (neither *ex propio vigore*, nor by operation of the Territorial Clause, nor by an otherwise constitutionally authorized congressional mandate) unless Puerto Rico expressly consented thereto. In a much narrower opinion, the Court of Appeals agreed that due process of law applied to Puerto Rico, but whether this was because of the Fifth or Fourteenth Amendment was left unclear. The binding effects of the "compact's" theoretical bilaterality advanced by the lower court in *Mora v. Torres, supra* were neither relied upon nor even mentioned by the appellate court. Such theory of congressional relinquishment of territorial power over Puerto Rico as delineated by the court in *Mora v. Torres* has been transformed into an *obiter dictum* by more recent developments. See *Harris v. Rosario, supra* ; *Torres v.*

Puerto Rico, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (applying Fourth Amendment protections); *Calero-Toledo v. Pearson Yacht Co.*, 416 U.S. 663, 668–69, n. 5, 94 S.Ct. 2080, 2084–2085 n. 5, 40 L.Ed.2d 452 (1974) (holding that Puerto Rico is subject to the Due Process Clause of either the Fifth or Fourteenth Amendments); *Examining Board v. Flores de Otero, supra*, 426 U.S. at 599–601, 91 S.Ct. at 2279–2281 (similarly holding as to equal protection guarantees).

28. The enabling statute in *RCA* expressly included plaintiffs' business as one subject to the challenged taxation. Plaintiffs attacked the statute as interfering with Congress' regulatory power under the Commerce Clause, arguing that they were already subjected to congressional regulation. The municipal ordinances were not the object of plaintiffs' constitutional assault therein.

29. Again, under the "compact" theory expounded in *RCA*, whatever authority is to be exercised over Puerto Rico by the federal government after adoption of the local constitution would emanate not from Article IV of the U.S. Constitution, but from the "compact" itself. *Hodgson v. Unión de Empleados*, 371 F.Supp. 56 (D.C.P.R.1974).

several amendments made or to be made thereto ... nor an Act to regulate commerce of February 4, 1887 and the acts amendatory thereof, according to Section 38 of the Organic Act of 1917, 39 Stat. 964, and which are still in force as part of the Federal Relations Act, shall apply to Puerto Rico." (91 PRR 404 at 418)

The Court, however, expressly ruled that even if Puerto Rico were bound by the same constitutional strictures as regulate commerce between the states of the Union, the tax would still be constitutional under the rule of *General Motors Corp. v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964).[30]

The Court's conclusion in *RCA, supra* that Congress relinquished its power to regulate interstate commerce in matters related to Puerto Rico has found no fertile ground in subsequent federal decisions. Cf. *Hodgson v. Unión de Empleados, supra* (such power exists as to application of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq.); *Caribtow Corp. v. Occupational Safety and Health R. Com'n*, 493 F.2d 1064 (1 Cir. 1974) (Congress has the power to apply the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678 to Puerto Rico under either the Interstate Commerce Clause or the Territorial Clause).[31] For the reasons that will follow, we must disagree with the holding of *RCA*.

### C

It is a widely accepted fact of history that two of the chief defects of the Articles of Confederation were the lack of power in Congress to regulate foreign and interstate commerce and the presence of power in the various states to do so. The results were inability to present a united front to for-

eign nations and the existence of commercial rivalries and reprisals between the states.[32] The calling of the constitutional convention of 1787 was largely accountable to this.[33] The situation was affronted and solved by vesting, *inter alia*, the authority to "regulate commerce with foreign nations and among the several States"[34] in Congress. Accordingly, the Commerce Clause is both the chief source of congressional regulatory power and, implicitly, a limitation on state legislative power.[35]

Although in a sense Article I, § 8 emerged from the crucible of federalism, the tenor of Clause 3 was not to organize interstate relations, but to *regulate commerce*; thus Justice Marshall's momentous pronouncement in *Gibbons v. Ogden, supra* :

"The subject to be regulated is commerce; and our constitution being ... one of enumeration, and not of definition, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word." (9 Wheat (U.S.) at 189).

Accordingly, Article I, § 8, Cl. 3 serves expressly as an affirmative investiture of congressional power over commerce. It does not state a prohibition, as recently reiterated by Justice Blackmun:

"The prohibitive effect of the clause on state legislation results from the Supremacy Clause and the decisions of this Court." (*Washington Rev. Dept. v. Stevedoring Ass'n*, 435 U.S. 734, 749, 98 S.Ct. 1388, 1398, 55 L.Ed.2d 682 (1978))

Such restrictive effect, which arises when the validity of state action conflicts with "dormant" congressional power, was rejected by the Court in *RCA v. Government of the Capital* as inapplicable to Puerto Rico. The same is brandished by plaintiffs herein

---

**30.** See our discussion, *infra*, on the merits of the applicability of the rule of *General Motors Corp. v. Washington* to this case.

**31.** Cf. also *Cabrera v. Unión de Choferes*, 256 F.Supp. 839 (D.C.P.R.1966).

**32.** Hamilton, *The Federalist*, Nos. 7, 11, 22; Madison, Id., No. 42; *Gibbons v. Ogden*, 9 Wheat (U.S.) 1, 244–5, 6 L.Ed. 23 (1824) (John-

son, J.); *Brown v. Maryland*, 12 Wheat (U.S.) 419, 445–6, 6 L.Ed. 678 (1827).

**33.** See the *Passenger Cases*, 7 How. (U.S.) 283, 445, 12 L.Ed. 702 (1849).

**34.** Article I, § 8, Cl. 3, U.S. Constitution.

**35.** See Tribe, L., *American Constitutional Law*, § 5–4, Pp. 232–236.

against the challenged tax. We must thus examine the source of such constitutional stricture to determine its consequence, if any, on Puerto Rican legislation.

The negative implications of the Commerce Clause arise from more than a century of judicial construction of the structural interplay between Article I, Section 8, Cl. 3 and several other constitutional provisions, together with the basic tenets of federalism and the intrinsic purport of the Commerce Clause itself.[36] Just as congressional interstate commerce powers are fettered by limiting clauses in the constitution,[37] by the uniformity clause of Art. I, § 8, *ante* or by the Tenth Amendment,[38] State powers to regulate or tax interstate commerce are limited, in the absence of congressional acquiescence to the contrary,[39] by the prohibitive implications that arise from the affirmative concession of power afforded to Congress by Article I, § 8 of the Constitution.[40]

"It is by interpreting 'these great silences of the Constitution' that the Supreme Court has limited the scope of what the states might do." [41]

Professor Tribe emphasizes the nature of the power in the search for construing the clause:

"Whether the affirmative grant of commercial power to Congress should be construed to circumscribe state action in some or all cases has posed no small problem of construction. The controversy has ultimately been framed by asking whether, as a general rule or in selected instances, the nature of the power vested in Congress requires its exclusive exercise by that body." [42]

The prohibitive effect of the Commerce Clause is the conceptual scion of more than sixteen decades of American jurisprudence.[43] Under the contemporary doctrine, state regulation affecting interstate commerce "will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation".[44] The clause's effect on state taxation of interstate commerce, although differently phrased, is similarly assessed in terms of an

---

**36.** See Sholley, J., *The Negative Implications of the Commerce Clause*, 3 U.Chi.L.Rev. 556 (1935) and cases cited therein. Cf. also Tribe, L. *American Constitutional Law*, Ch. 6, Pp. 319 et seq.

**37.** E. g. U. S. Constitution Art. I, § 9, Cl. 6: "No preference shall be given by any Regulation of Commerce Revenue to the Ports of one State over those of another"; U.S.Const. Art. I, § 9, Cl. 1 (barring Congress from prohibiting "migration and importation" of persons from existing states prior to 1808).

**38.** "The power not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." See *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); Cf. also Tribe, L. *Unraveling National League of Cities: the New Federalism and Affirmative Rights to Essential Government Services*, 90 Haw.L.Rev. 1065 (1977); Percy B., *National League of Cities v. Usery: The Tenth Amendment is Alive and Doing Well*, 51 Tulane L.Rev. 95 (1976).

**39.** See Tribe, *Op. Cit.*, § 6–31, Pp. 401–404 (Congressional Ratification and its Limits).

**40.** See *Gibbons v. Ogden, supra*; *Brown v. Maryland, supra*; *Cooley v. Board of Wardens*,

12 How. (U.S.) 299, 13 L.Ed. 996 (1852); *Bowman v. Railway Co.*, 125 U.S. 465, 8 S.Ct. 689, 31 L.Ed. 700 (1888).

**41.** Tribe, *Op. Cit.*, at P. 320, quoting *H.P. Hood & Sons, Inc. v. Dumond*, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949) (Jackson, J.).

**42.** Id., at Pp. 320–21, citations omitted.

**43.** See Id., § 6–3, Pp. 321–24. Originating in the conflicting strands of Madison and Chief Justice Taney, the doctrine evolved upon the "police power" considerations of sovereignty propounded by subsequent cases (see *Gibbons v. Ogden, supra*, 9 Wheat at 208; *The License Cases*, 46 U.S. (5 How.) 504, 584, 12 L.Ed. 256 (1847) through the "local-national" dichotomy of *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851)), the "direct-indirect" test (e. g., *Smith v. Alabama*, 124 U.S. 465, 8 S.Ct. 564, 31 L.Ed. 508 (1888); *Erb v. Morasch*, 177 U.S. 584, 20 S.Ct. 819, 44 L.Ed. 897 (1900) and Tribe, *Op. Cit.*, § 6–4, P. 326, cases at nn. 10, 11) into the current doctrine. See, generally, Shalley, *Op. Cit.*

**44.** Tribe, L. *Op. Cit.*, § 6–5, P. 326. See cases cited at n. 1 therein.

interest-balancing process.[45] Commerce Clause caselaw has thus sought to achieve an equilibrium between the constitutional need for regulatory uniformity in this area and the intrinsic necessities of state sovereignty. State legislation affecting interstate commerce is currently permitted (in the absence of congressional acquiescence to broader intervention) to the extent that it does not become adverse interference therewith and pursues legitimate interests endemic to state authority.

### D

Insofar as Puerto Rico is concerned, all of the foregoing constitutional considerations are equally befitting.

Firstly, the existence of congressional power to regulate interstate or foreign commerce affecting the island cannot be gainsaid. The source of such congressional authority has been recently clarified by the Supreme Court of the United States in *Harris v. Santiago Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). Said case concerned a challenge to the constitutionality of the Aid to Families with Dependent Children program (AFDC), 42 U.S.C. § 601 et seq. inasmuch as it discriminated against Puerto Rican residents. In upholding the pertinent provisions, the Supreme Court stated:

"Congress, which is empowered under the Territory Clause of the Constitution, U.S.Const. Art. IV, § 3, Cl. 2, to 'make all needful Rules and Regulations respecting the Territory ... belonging to the United States' may treat Puerto Rico differently so long as there is a rational basis for its actions." (446 U.S. 651, 100 S.Ct. 1930)

It is thus settled that, regardless of the nature of the particular constitutional relationship between Puerto Rico and the United States,[46] the Territorial Clause is a source of congressional power over the island.[47]

Second, the underlying policies that moved the Founding Fathers to approve the clause are equally applicable to commercial intercourse between the island and the States or foreign countries. Allowance of unrestrained interference by Puerto Rico on interstate or foreign commerce could, need-

**45.** Id., § 6–14, Pp. 344–346; see also *Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); *Washington Rev. Dept. v. Stevedoring Ass'n*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978).

**46.** We have no occasion today to interpret the full bearing of the *Harris* case on the "compact" theory, *ante*. However, prior judicial pronouncements establishing a binding, bilateral relationship whereby Congress relinquished its Art. IV, Section 3, Cl. 2 power over Puerto Rico appear to have been rendered effectless by said decision. See, however, regarding the historical development of the U.S.—Puerto Rico relationship and interpretations or criticism of the "compact" theory, Leibowitz, *The Applicability of Federal Law to the Commonwealth of Puerto Rico*, 56 Geo.L.J. 219 (1967). Helfeld, *How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?* 39 Rev.Jur. UPR 169 (1969); Stern, *Notes on the History of Puerto Rico's Commonwealth Status*, 30 Rev.Jur. UPR 33 (1960); Serrano, *The Territorial Status of Puerto Rico and its Effect on the Political Future of the Island*, 11 Rev.Jur.Inter. 385 (1976). See also cases cited at n. 7 in *Hodgson v. Unión de Empleados*, 371 F.Supp. 56, 59 (D.C.P.R. 1974). Cf. also, regarding congressional power under U.S.Const. Art. IV, § 3, Cl. 2; *American Insurance Co. v. Canter*, 26 U.S. (1 Pet) 511, 542–43, 7 L.Ed. 242 (1828); *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673, 65 S.Ct. 870, 880, 89 L.Ed. 1252 (1945); *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 105–107, 73 S.Ct. 1007, 1010–1011, 97 L.Ed. 1480 (1953); *De Lima v. Bidwell*, 18 U.S. 1, 19, 21 S.Ct. 743, 752, 45 L.Ed. 1041 (1901); *U. S. v. Kagama*, 118 U.S. 375, 380, 6 S.Ct. 1109, 1111, 30 L.Ed. 228 (1886); *U. S. v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936). As to the current validity of congressional exemptions to Puerto Rico of maritime provisions (otherwise applicable to the states) under the Federal Relations Act, Cf. *García v. Friesecke*, 597 F.2d 284 (1 Cir. 1979); the particular connotations of the term "territory" are given little importance therein.

**47.** Another source of territorial power historically attributed to Congress is its inherent and implied powers as sovereign. As to such dual nature of congressional power, see *American Insurance Co. v. Canter, supra*. Accordingly, congressional authority to legislate on matters concerning Puerto Rico, including Law 600, is derived from these sources.

less to say, foster rivalries with the States of the Union and prevent regulatory uniformity, even when deemed necessary by Congress. The "necessity of a superintending authority over the reciprocal trade of the confederated states"[48] urged by Madison is no less pressing in Puerto Rico's case.

Third, Puerto Rico's present internal authority, although not demarcated by the Tenth Amendment,[49] is very similar to that possessed by the states. Puerto Rico has been historically conceded various degrees of "police power". Cf., e. g. *Sancho v. Bacardi*, 109 F.2d 57 (1 Cir. 1940). Presently, Commonwealth powers acquired through the Federal Relations Act and the local Constitution closely resemble those held by the states.[50] Cf. *Puerto Rico v. Shell Co.*, 302 U.S. 253, 261, 58 S.Ct. 167, 171, 82 L.Ed. 235 (1937); see Federal Relations Act, § 9, *ante*.

Finally, we see no reason to conclude that the constitutional policy of prevention of adverse interference of state legislation upon interstate commerce should not apply to Puerto Rico. We have found no indication that Congress intended otherwise. Nor can we infer, as did the local Supreme Court in *RCA v. Government of the Capital*, *supra*, that the exemption from, *inter alia*, the Interstate Commerce Act contained in the Federal Relations Act meant anything more than that.[51] The Court of Appeals for the First Circuit in *Caribtow v. Occupational Safety & Health R. Com'n*, 493 F.2d 1064 (1 Cir. 1974) reached a similar conclusion when it observed:

"But § 751 [exempting Puerto Rico from, *inter alia*, the Interstate Commerce Act] does not in terms or by any reasonable implication mean any more than what it clearly says: that two particular laws shall not operate in Puerto Rico."[52]

To hold otherwise would have signified that Congress, in the absence of any express provision or reasonable implication to that effect, delegated to Puerto Rico power that it chose to deny to all the States of the Union. Such congressional munificence must appear either expressly or by clear implication.

We thus hold that, in the absence of clear congressional acquiescence to the contrary,[53] Puerto Rico is constrained by the prohibitory implications of the Commerce Clause as construed by the Supreme Court of the United States. This, however, does not mean that the Commerce Clause applies to Puerto Rico *ex propio vigore*, but that its prohibitive effect is binding on the Commonwealth through the Territorial Clause, Art. IV, § 3, Cl. 2[54] as an implied corollary of congressional commerce powers thereunder. See *Duty Free Shoppers, Ltd. v. Tax Com'r*, 464 F.Supp. 730 (D.C.Guam 1979); Cf. also *Pacific Broadcasting Corp. v. Riddell*, 427 F.2d 519 (9 Cir. 1970); *Asiatic Trans-Pacific, Inc. v. Maddox*, 371 F.2d 132 (9 Cir. 1967). See *Americana of Puerto Rico, Inc. v. Kaplus*, 368 F.2d 431 (3 Cir. 1966), cert. den. 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874.

**48.** Madison, The Federalist No. 42.

**49.** "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**50.** See Leibowitz, *Op. Cit.*

**51.** See Helfeld, *How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?* 39 Rev.Jur. UPR 169 (1969).

**52.** 493 F.2d at 1068.

**53.** Congress may, of course, expressly delegate (under the Territorial Clause) commerce powers to Puerto Rico not possessed by the States. See, e. g. *Downes v. Bidwell, supra*. This does

not necessarily mean, however, that congressional "ratification" could not uniformly concede such powers to the States themselves. See *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946); Tribe, *Op. Cit.*, Pp. 401–404.

**54.** See *Caribtow v. Occupational Safety & Health Com'n.*, p. 1068, n. 11 where the validity of the dictum in *Buscaglia v. Ballester, ante*, appears to be questioned. Compare Helfeld, *Op. Cit.* with Fuster, *The Origins of the Doctrine of Territorial Incorporation and its Implications Regarding the Power of the Commonwealth of Puerto Rico to Regulate Interstate Commerce*, 43 Rev.Jur. UPR 259; Cf. also *Hodgson v. Unión de Empleados, supra*.

## III

■ We turn now to the merits of this case. Plaintiffs allege that the application to them of Law No. 113 of July 10, 1974 and its statutory predecessors through the challenged municipal ordinances violates the Interstate and Foreign Commerce Clauses, U.S.Const. Art. I, § 8, Cl. 3 and the "Import—Export" Clause, U.S.Const. Art. I, § 10, Cl. 2. It is asserted that the tax places an undue discriminatory burden on interstate and foreign commerce and that it falls under the constitutional prohibition against laying "Imposts or Duties on Imports or Exports".[55] Defendants respond that the tax constitutes a permissible regulation of commerce under applicable case law. We start by analysing plaintiffs' arguments under the Commerce Clause.

Throughout the first half of the nineteenth century, the Supreme Court consistently declared that a state tax upon interstate commerce was prohibited by the Commerce Clause. *Brown v. Maryland*, 90 U.S. (12 Wheat) 419, 6 L.Ed. 678 (1827). Subsequently, various exceptions were created, largely upon semantical or formalistic considerations. See, e. g., *Spector Motor Service, Inc. v. O'Connor*, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951). In recent years, the Supreme Court has abandoned such formalistic approach in favor of a more realistic functional calculus. Thus, in *Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Court overruled a series of cases which had held that any state tax on "the privilege of doing business" imposed on a multistate business was *per se* unconstitutional. Through this realistic approach, the Court synthesized the elements indispensable in this type of legislation. It stated that such a tax is valid when it is (1) applied to an interstate activity with substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state. We examine the tax herein in order to ascertain whether it complies with such constitutional exigencies.

The municipal license tax is obviously neither a franchise tax, *Cornell Steamboat Co. v. Sohmer*, 235 U.S. 549, 35 S.Ct. 162, 59 L.Ed. 355 (1915), nor an *ad valorem* in lieu of property tax. See *Adams Mfg. Co. v. Storen*, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365 (1938). Although it could nominally be considered as a tax for the privilege of doing business within the particular municipalities, as applied to plaintiffs it is undisputably one imposed on gross receipts for the privilege of engaging in interstate commerce. See 21 LPRA 651c, *Complete Auto Transit v. Brady, supra.*[56]

In applying the Commerce Clause's multifactor test to the challenged tax, we must probe the relationship between plaintiffs and the particular municipalities.[57] We start with the "nexus" requirement.

---

55. U.S.Const. Art. I, § 10, Cl. 2.

56. See generally, Lockhart, *Gross Receipts Taxes on Interstate Transportation and Communication*, 57 Harv.L.Rev. 40 (1943).

57. Defendants initially argue that the privilege of doing business is granted not by themselves as municipalities, but by the Commonwealth of Puerto Rico. They contend that under Article VI, Sections 1 and 2 of the Commonwealth Constitution, the municipalities are but "mere creatures of the legislature" and the imposition and levying of taxes are undelegated attributes of said legislature as sovereign. Allegedly, the municipal assemblies may thus only "fix the tax rate and collect" and it is the Commonwealth which *de jure* imposes and levies the tax. Accordingly, defendants would have us analyze the merits of this case as if to all effects the Commonwealth of Puerto Rico were the real defendant. They do not deny, however, that they may sue and be sued, 21 LPRA 1102. Neither have they sought the inclusion of the Commonwealth as either a real party in interest, F.R.Civ.P. 17 or as a necessary or indispensable party under F.R.Civ.P. 19.

We must reject such a semantical argument. Local regulatory power may be delegated to municipalities, such as is the case herein. *Laclede Gas Light Co. v. Murphy*, 170 U.S. 78, 18 S.Ct. 505, 42 L.Ed. 955 (1898). On such account, municipalities have long been recognized certain "police powers" necessary in the enforcement of local government supervision. *Western Union Tel. Co. v. New Hope*, 187 U.S. 419, 23 S.Ct. 204, 47 L.Ed. 240 (1903). Once such powers have been lawfully delegated (see 21 LPRA 1101 et seq.; Cf. 21 LPRA 641 as to the power to "levy and impose" the tax) defendants may not shield themselves behind the

### A

The Commerce Clause "requires 'some definite link, some minimum connection between a state and the person, property or transaction it seeks to tax' ".[58] This requirement is similar to the due process demand, *National Bellas Hess, Inc. v. Dept. of Revenue, supra*, 386 U.S. at 756, 87 S.Ct. at 1391, that local activities be sufficiently substantial to warrant any tax. See *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 464, 79 S.Ct. 357, 365, 3 L.Ed.2d 421 (1959); compare with *Heublein, Inc. v. South Carolina Tax Com'n.*, 409 U.S. 275, 280, 93 S.Ct. 483, 487, 34 L.Ed.2d 472 (1972).

Plaintiffs argue that they are neither engaged in shipping within the municipalities nor is their freight earned therein. They reason that the eminently interstate nature of their business requires the incidental use of port and other accessory facilities, but that such tangential use is insufficient to comply with the "nexus" requirement. We disagree. The enabling statute in this case clearly specifies that only persons "engaged . . . in the rendering of any service . . . or in any industry or business in the municipalities of the Commonwealth of Puerto Rico" shall be subject to the tax. 21 LPRA 651c. Plaintiffs admit that they have or had at pertinent times such "offices and places of business" in Puerto Rico.[59] They neither dispute that they had for such purposes certain property located within the defendant municipalities, and that the various accessorial services offered by them were performed within defendants' territorial jurisdictions. They cite, however, *Michigan-Wisconsin Pipe Line v. Calvert*, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954) to bolster their proposition that such incidental activity "is so closely related to interstate transportation as to be practically a part of it".[60] Under such reasoning, accessorial services would be immune from the tax because they are mostly unavoidable concomitants of interstate business and they would consequently be insufficient to establish the required nexus. Such rigid analysis has been recently abandoned in *Washington Rev. Dept. v. Stevedoring Assn.*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). In said case, similar arguments harbored by the "Stevedoring Cases"[61] were expressly rejected. The Court concluded that although stevedoring was incidental to interstate transportation, under *Complete Auto* even such "interstate business must pay its way".[62]

The current rule is expressed in *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980):

"The requisite 'nexus' is supplied if the corporation avails itself of the 'substantial privilege of carrying on business' within the State: and '[t]he fact that a

---

Commonwealth as if they were inexistent juridical entities.

Accordingly, we rule that when it is a city's regulatory burden which is questioned under the Commerce Clause, it is the city's relationship with the given plaintiff which must be examined unless of course, applicable law indicates otherwise. See *Sprout v. City of South Bend*, 277 U.S. 163, 48 S.Ct. 502, 72 L.Ed. 833 (1928); *Packet Co. v. Keokuk*, 95 U.S. 80, 24 L.Ed. 377 (1877); Cf. *Postal Telegraph Cable Co. v. Richmond*, 249 U.S. 252, 257, 39 S.Ct. 265, 63 L.Ed. 590 (1919); *St. Louis v. Western Union Telegraph Co.*, 148 U.S. 92, 98, 13 S.Ct. 485, 487, 37 L.Ed. 380; 149 U.S. 465, 13 S.Ct. 990, 37 L.Ed. 810 (1893) (municipality with chartered powers under state constitution).

**58.** *National Bellas Hess, Inc. v. Dept. of Rev. of Illinois*, 386 U.S. 753, 756, 87 S.Ct. 1389, 1391, 18 L.Ed.2d 505 (1967), quoting *Miller Bros. Co.*

*v. Maryland*, 347 U.S. 340, 44–45, 74 S.Ct. 535, 538–539, 98 L.Ed. 744 (1954).

**59.** Stipulation of Facts, Exh. A to Pretrial Order.

**60.** *Baltimore & Ohio S.W.R. Co. v. Burtch*, 263 U.S. 540, 544, 44 S.Ct. 165, 166, 68 L.Ed. 433 (1924). See cases cited in *Michigan-Wisconsin, supra*, 347 U.S. 168, n. 5, 74 S.Ct. 402, n. 5.

**61.** *Puget Sound Stevedoring Co. v. State Tax Comm'n.*, 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68 (1937) and *Joseph v. Carter & Weekes Stevedoring Co.*, 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993 (1947).

**62.** *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938).

548

tax [63] is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction'." (445 U.S. 437, 100 S.Ct. 1231, quoting *Wisconsin v. J. C. Penney Co.*, 311 U.S. 435, 444–445, 61 S.Ct. 246, 249–250, 85 L.Ed. 267 (1940)).[64]

Plaintiffs have used the municipalities as ports, and as outlets for the distribution of goods to all parts of the island. Numerous accessorial services are performed at plaintiffs' facilities therein. Under such circumstances, this "substantial privilege" afforded by defendants to Sea-Land and Gulf is sufficient to constitute the required nexus.

**B**

The Commerce Clause next requires that the tax be related to significant services provided by the municipalities. Plaintiffs argue that the vast majority of the benefits afforded to their local facilities come from either the Commonwealth of Puerto Rico, agencies thereof or private enterprise. They allege that defendants provide them nothing as the required constitutional *quid pro quo* for the tax.[65]

This constitutional precept was explained by the Supreme Court in *Ingels v. Morf*, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937), where it noted:

"To justify the exaction by a state of a money payment burdening interstate commerce, it must affirmatively appear that it is demanded as reimbursement for the expense of providing facilities, or of enforcing regulations of the commerce which are within its constitutional power.... This may appear from the statute itself, ... or from the use of the money collected to defray such expense."

(300 U.S. at 294, 57 S.Ct. at 441, citations omitted)

The statute herein states:

"The municipal assemblies of all the municipalities of the Commonwealth of Puerto Rico are hereby authorized to levy and collect, ... the taxes hereinafter enumerated ... *and the proceeds thereof shall be used to meet their budgetary expenses.*" 21 LPRA 641 (emphasis supplied)

It is thus apparent that the money collected is destined to defray municipal expenses. Plaintiffs do not quarrel with this statutory language; neither do they assert that the exactions are not *de facto* utilized to meet such expenses. See *Sprout v. City of South Bend*, 277 U.S. 163, 48 S.Ct. 502, 72 L.Ed. 833 (1928). It is argued, however, that the municipalities provide plaintiffs with no services and thus that they incur in no expenses regarding Sea-Land or Gulf. Such averment, however, is belied by the evidence. Although concededly the fire department, and in some cases the police are ascribed to Commonwealth agencies, there are various other direct and indirect services provided by defendants. These include sewer facilities, construction, repair and maintenance of roads adjacent to plaintiffs' terminals (which are intensively utilized by plaintiffs as an outlet for their trailers), garbage dumps, variegated health and medical facilities and, succinctly stated, "the benefit of a trained work force and 'the advantages of a civilized society'". *Exxon Corp. v. Wisconsin Rev. Dept.*, 447 U.S. 207, 228, 100 S.Ct. 2109, 2122, 65 L.Ed.2d 66 (1980), quoting *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, at 445, 99 S.Ct. 1813, at 1819, 60 L.Ed.2d 336.

It suffices that the charge is generally "structured to compensate the government

---

**63.** Although the Court's analysis is phrased in terms of plaintiffs' relationship with the "State", we have ruled that the same is applicable to the municipalities. See note 57, *supra*.

**64.** Accord, *Exxon Corp. v. Wisconsin Rev. Dept.*, 447 U.S. 207, 225, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66 (1980).

**65.** The Due Process Clause requires a rational relationship between the income attributed to the municipalities and the local value of the enterprise. *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 272–73, 98 S.Ct. 2340, 2343–2345, 57 L.Ed.2d 197 (1978). Sea-Land and Gulf have not phrased their arguments in this context. However, as noted hereinafter, such requirement *is a forcible component of plaintiffs'* cause.

for the benefit conferred". *Massachusetts v. United States*, 435 U.S. 444, 462, 98 S.Ct. 1153, 1165, 55 L.Ed.2d 403 (1978).

## C

Plaintiffs next contend that the tax discriminates against interstate commerce. They argue that such discrimination exists because "every state has equal rights when taxing the commerce it touches" and "[t]hus, there exists the danger that such taxes can impose cumulative burdens upon interstate transactions which are not presented to local commerce".[66]

The Supreme Court has recognized that a large part of the rationale for granting Congress control over interstate commerce "was to insure ... against discriminating state legislation". *Welton v. Missouri*, 91 U.S. 275, 280, 23 L.Ed. 347 (1876). Thus, as noted by Professor Tribe:

> "[T]he Court has consistently struck down those state taxes which it concludes unjustifiably benefit local commerce at the expense of out of state commerce." [67]

See, e. g., *Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939); *Welton v. Missouri, supra; Morrill v. Wisconsin*, 154 U.S. 626, 14 S.Ct. 1206, 23 L.Ed. 1009 (1877); *Guy v. Baltimore*, 100 U.S. 434, 25 L.Ed. 743 (1880); *Tiernan v. Rinker*, 102 U.S. 123, 26 L.Ed. 103 (1880); *Webber v. Virginia*, 103 U.S. 344, 26 L.Ed. 565 (1881).

On some occasions, the Supreme Court has probed beyond the facial effect of the challenged legislation and analyzed its economic consequences regarding a particular industry. See *Robbins v. Shelby County Taxing District*, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887); *Nippert v. City of Richmond*, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946); *Alaska v. Arctic Maid*, 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961).

The statute here at stake applies to "*[e]very person* engaged, for profit, in the

rendering of any service ... in the Municipalities of the Commonwealth of Puerto Rico". 21 LPRA 651c (emphasis supplied). It covers both local and non-domiciliary industries. The exactions are not measured by the local or interstate character of the taxed business. It is thus evidently not discriminatory on its face. Moreover, assuming it is fairly apportioned,[68] plaintiffs have signaled no set of facts indicative of *de facto* economic discrimination.[69] *Washington Rev. Dept. v. Stevedoring Ass'n, supra*, 435 U.S., P. 750, 98 S.Ct., p. 1399. However, the fact that the tax, when viewed in isolation does not discriminate against interstate commerce does not arrest the analysis. We must still settle whether it places on plaintiffs "burdens of such a nature as to be capable ... of being imposed ... or added to ... with equal right by every state which the commerce touches, ... so that without the protection of the commerce clause [they] would bear cumulative burdens not imposed on local commerce". *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 255, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938).

The parties predictably disagree over the question of whether an actual burden need be shown. Plaintiffs cite cases such as *Gwin, White & Prince, Inc. v. Henneford*, 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272 which states:

> "Unlawfulness of the burden depends upon its nature, measured in terms of its capacity to obstruct interstate commerce, and not on the contingency that some other state may first have subjected the commerce to a like burden." (305 U.S. at 440, 59 S.Ct. at 328)

Defendants, on the other hand, rely on decisions like *General Motors v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964) which hold that the taxpayer must show which is the burden imposed by other

---

**66.** Plaintiffs' Post Trial Brief, P. 39.

**67.** Tribe, *Op. Cit.*, P. 354–55.

**68.** See our discussion as to the apportionment requirement at part D, *infra*.

**69.** We are mindful of the rule that "a taxpayer claiming immunity from a tax has the burden of establishing his exemption". *Norton Co. v. Dept. of Rev. of Illinois*, 340 U.S. 534, 537, 71 S.Ct. 377, 380, 95 L.Ed. 517 (1951).

states on the identical matter taxed by defendant.

The Supreme Court has recently faced such inconsistency. In *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980), it observed:

> "Inasmuch as New York does not presently tax the dividends in question, actual multiple taxation is not demonstrated on this record. The Vermont courts placed some reliance on this fact, ... and much of the debate in this Court has aired the question whether an actual burden need be shown. Compare *Standard Pressed Steel Co. v. Department of Revenue*, 419 U.S. 560, 563–564 [95 S.Ct. 706, 709, 42 L.Ed.2d 719] (1975), and *Freeman v. Hewit*, 329 U.S. 249, 256 [67 S.Ct. 274, 278, 91 L.Ed. 265] (1946), with *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. at 462–463 [79 S.Ct. at 364–365] and *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292 [64 S.Ct. 950, 88 L.Ed. 1283] (1944). See also *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 452, n. 17 [99 S.Ct. 1813, 1823, n. 17, 60 L.Ed.2d 336] (1979). We agree with Mobil that the constitutionality of a Vermont tax should not depend on the vagaries of New York tax policy. But the absence of any existing duplicative tax does alter the nature of appellants claim." (445 U.S. 444, 100 S.Ct. 1235)

The Court turned to analyze the practical probability that such duplicative burden on Mobil's "intangible goods" would ensue, and concluded that there was no substantial risk that New York impose a constitutional "business situs" tax over the totality of the dividends.[70]

The tax under assault herein concededly is not imposed by any other city or state. Although this does not foreclose plaintiffs' argument thereagainst, the nature of their claim is altered.

If we assume that the tax is in fact imposed upon plaintiffs' commercial activity within the particular municipalities, any risk of duplicative taxation would be minimized, not to say completely eliminated. See *United Air Lines v. Mahin*, 410 U.S. 623, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973). In this sense, the danger of multiple tax burdens largely depends on compliance with the apportionment requirement of *Complete Auto*, discussed forthwith.

### D

In *Western Live Stock v. Bureau*, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1937) a case whose doctrine has been revitalized by recent decisions,[71] the Court stated:

> "All of these taxes in one way or another add to the expense of carrying on interstate commerce, and in that sense burden it; but they are not for that reason prohibited.... The vice characteristic of those which have been held invalid is that they have placed on the commerce burdens of such nature as to be capable, in point of substance, of being imposed ... or added to ... with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause it would bear cumulative burdens not imposed on local commerce." (303 U.S. at 255–56, 58 S.Ct. at 548–549, citations omitted)

Historically, states have developed various methods designed to prevent such "vice characteristic" and to thus comply with the constitutional mandate. The use of apportionment formulas has been favored because in theory, they prevent interstate commerce from being cumulatively burdened by repeated taxation of the same

---

70. The Court assumed, without passing "on the constitutionality of a hypothetical New York tax" that even if said State had the authority to lay some tax on appellant as its "business situs", such authority was not exclusive, nor did it override appellee Vermont's interest in taxing a proportionate share of such dividend income. 445 U.S. 445, 100 S.Ct. 1236. Accord, *Exxon Corp. v. Wisconsin Rev. Dept.*, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980).

71. See *Complete Auto. Transit v. Brady, supra; Washington Rev. Dept. v. Stevedoring Ass'n, supra.*

incident. See *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978). Additionally, when taxes are directly related to sufficiently local activities of a multistate business, they are by that very fact uniquely defined and thus not capable of multiple application. Thus, the tax in *Western Live Stock v. Bureau, supra* was found constitutional because:

> "[t]he tax is not one which in form or substance can be repeated by other states. . . . [R]eceipts from subscriptions are not included in the measure of the tax. It is not measured by the extent of the circulation of the magazine interstate. All the events upon which the tax is conditioned—the preparation, printing and publication of the advertising matter, and the receipts of the sums paid for it—occur in New Mexico and not elsewhere." (303 U.S. 250, 260, 58 S.Ct. 546, 550, 82 L.Ed. 823 (1938)).

Accordingly, when the "privilege taxed is exercised before interstate commerce begins" [72] or the tax is imposed upon a sufficiently local incident such as "storage",[73] it has been sustained, but when the exaction has been found to be on goods actually "moving in interstate commerce" [74] or consumed therein,[75] the law has succumbed under commerce clause attack.

The fact that the instant tax is imposed upon the gross receipts from interstate commerce does not signify that it is exacted upon an insufficiently local subject matter. Even when under the old cases, the levying of taxes on the gross receipts from interstate commerce was strictly prohibited,[76] states were allowed to use gross receipts from such commerce as the measure of an

otherwise constitutional tax. See *United States Express Co. v. Minnesota,* 223 U.S. 335, 32 S.Ct. 211, 56 L.Ed. 459 (1912); *Cudahy Packing Co. v. Minnesota,* 246 U.S. 450, 38 S.Ct. 373, 62 L.Ed. 827 (1918).

Thus, in *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964) the Supreme Court upheld a state tax on the privilege of doing business within the state, where the tax was measured by the gross receipts on sales of goods delivered within the state. The Court found that in the bundle of General Motors' corporate activity in Washington, its various divisions either maintained branch offices or warehouses within the state or otherwise retained "district managers, service representatives, and other employees who were residents of the state and who performed substantial services in relation to General Motors' functions therein, particularly with relation to . . . sales, upon which the tax was measured". 377 U.S. at 447, 84 S.Ct. at 1571. The governing rule was thus articulated:

> "The validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation." (377 U.S. at 440, 84 S.Ct. at 1568)

This reasoning is still operant, and has been applied in recent cases such as *Washington Rev. Dept. v. Stevedoring Ass'n, supra.* Defendants would thus have us leave the matter at this point by arguing that the municipal taxes are automatically apportioned to local "gross receipts", and thus constitutionally palatable. Although they admit that nowhere is a definition of the term "gross receipts" to be found, they contend that it is plaintiffs' duty under the

---

**72.** *Federal Compress & Warehouse Co. v. McLean,* 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622 (1934).

**73.** *United Air Lines v. Mahin,* 410 U.S. 623, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973).

**74.** *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954).

**75.** *Helson v. Kentucky,* 279 U.S. 245, 49 S.Ct. 279, 73 L.Ed. 683 (1929). Although the formalism expressed in this case no longer represents the law in the area, the Court's conceptual distinctions as to taxable activities are useful for our purposes.

**76.** See *Freeman v. Hewit,* 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946).

Acts to construe a constitutionally permissible definition. By so interpreting the law, defendants present us with an impregnable statute, inasmuch as plaintiffs would be estopped from construing it in a constitutional manner and then traverse their averments as to such interpretation.[77]

We disagree. Admittedly, there are several ways in which the municipalities may exact a constitutionally fair demand by taxing plaintiffs' gross receipts from interstate commerce. They may tax receipts from plaintiffs' purely local activities, such as the accessorial services, *Washington Rev. Dept. v. Stevedoring Ass'n, supra*, or devise apportionment formulas of various types.[78] They could exact an *ad valorem* in lieu of property tax[79] or design an allocation or apportionment method that would exact such a "constitutionally fair demand" for each one of defendant municipalities.[80] *General Motors Corp. v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964). But it is defendants' delegated duty to "levy and impose" the tax. 21 LPRA 651b. Plaintiffs need only comply with constitutional exactions thereunder, and it is not incumbent upon them to create an apportionment method not mandated by the law.

Defendants are empowered to collect an otherwise unapportioned tax so long as it is imposed only on those receipts from interstate transactions which can be ascribed to activities taking place wholly within their jurisdiction. Whatever method is preferred by the municipalities to apportion said taxes is not of our concern, unless specifically challenged in a case. But although the statute at stake herein requires that the tax be computed "by taking as a basis the volume of business during its accounting year" 21 LPRA 651f and that the total amount of gross receipts be reported under oath, 21 LPRA 651i, nowhere is the term "gross receipts" defined. If such term were interpreted (as is apparently the case with purely local business) as including all receipts for services in which plaintiffs' facilities within the municipalities were used, the tax would no doubt be imposed upon considerable unallocated activity for which the municipalities serve merely as relay stations. If it were construed as a tax upon receipt actually received within their municipal offices, defendants would be taxing sizeable activity that has no relation to the municipalities.[81] But there is no indication

---

**77.** It is important to note that the municipalities retain power to review the taxpayer's computation and make an independent assessment, 21 LPRA 651n.

**78.** See *Moorman Mfg. Co. v. Bair, supra; Mobil Oil Corp. v. Commissioner of Taxes, supra; Exxon Corp. v. Wisconsin Rev. Dept., supra.*

**79.** See *United States Express Co. v. Minnesota, supra.* This assumes, however, that cumulative taxation to that effect is inexistent within Puerto Rico. Cf. *Meyer v. Wells, Fargo & Co.*, 223 U.S. 298, 299, 32 S.Ct. 218, 219, 56 L.Ed. 445 (invalidating a gross receipts tax levied in addition to the property tax).

**80.** Plaintiffs constantly cite in their briefs the case of *Philadelphia & Southern Steamship Co. v. Pennsylvania*, 122 U.S. 326, 7 S.Ct. 1118, 30 L.Ed. 1200 (1886) for the proposition that whatever the construction of the tax, if the same places a burden over their freight, it would be *per se* unconstitutional. Although this case contributed to develop current doctrinal trends by repudiating the formalistic distinctions propounded by *State Tax on Ry. Gross Receipts*, 82 U.S. (15 Wall.) 284, 21 L.Ed. 164 (1873), we think its holding as to the total immunity of

interstate freight is no longer valid. Admittedly, the Court noted therein that a tax that fell on the freight would be as unconstitutional as if levied against interstate transportation itself, 122 U.S. at 336–338, 7 S.Ct. at 1119–1121. Nevertheless, under *Complete Auto*, such interstate transportation is now subject to constitutionally apportioned taxes. Cf. also, generally, *Moran v. New Orleans*, 112 U.S. 69, 5 S.Ct. 38, 28 L.Ed. 653 (1884); *Gloucester v. Pennsylvania*, 114 U.S. 196, 5 S.Ct. 826, 29 L.Ed. 158 (1885) (exactions on interstate carriers by ocean).

**81.** It appears that defendants' reticence in designing an apportionment or allocation method is partly due to their inability to adjust it to plaintiffs' method of aggregately accounting their worldwide revenues. Although the nature of plaintiffs' business is such that said method may be more advantageous for them, "a company's internal accounting techniques are not binding on a State [or municipality] for tax purposes". *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 226, 100 S.Ct. 2119.

of what "gross receipts" signify, nor are there guidelines that might help us construe such term.[82] In this sense, it is as vague as if the statute contained no apportionment language whatsoever.

Defendants contend, however, that the method adopted by them upon commencement of this action cured all constitutional infirmities possessed by the tax theretofore. They cite *Pan American W. Air. v. Duly Auth. Gov. of Virgin Islands*, 459 F.2d 387 (3 Cir. 1972) as authority for the proposition that a similar allocation method is constitutionally sound.

In *Pan American*, an analogous gross receipts tax was imposed upon appellant, an air carrier exclusively engaged in interstate and foreign transportation. The statute therein, however, expressly provided that the taxes were to be computed "in proportion to the extent of the trade carried on or of the business done" within the Virgin Islands. 459 F.2d, at 392. Accordingly, the Commissioner of Taxes selected an official formula to apply the tax to appellants therein. It exacted the following:

> "a tax of two percent of its gross receipts from all passenger tickets sold in the Virgin Islands . . . and two percent of all revenues received in the Virgin Islands for carriage of excess baggage or freight, irrespective of origin or destination of such traffic." (Id., at 392)

The Court sustained the tax, holding that no multiple taxation or disproportionate exactions had been shown.

In the case at bar, defendants have at all times refused to officially devise a formula or allocation method that would provide plaintiffs with indications as to which "gross receipts" to include in the returns. Instead, they have required an agreement designed to nominally comply with the filing requirements of the law and thus prevent the imposition of penalties to plaintiffs during the pendency of this litigation. They insist, however, that it is still plaintiffs' duty to provide the pertinent statutory construction of the taxable receipts.

Under the terms of this agreement,[83] plaintiffs would file returns, reporting receipts from all outbound or northbound sales, whether paid in advance or outstanding. The cutting of the waybill would be determinative of the place where, for such purposes, the "sale" was effected.[84] In lieu of the balance sheet required by the statute, plaintiffs were required a statement by a Certified Public Accountant certifying the gross receipts as computed under the instructions given.

The evidence conclusively shows that the cutting of the waybill bears no "rational relationship", *Exxon Corp. v. Wisconsin Dept. of Revenue, supra*, to the apportionable volume of business had by plaintiffs in a given municipality or elsewhere. Not only does it not reflect the place at which a particular sale is made or where the actual collection therefor is effected, but it bears no relation to where the services are actually rendered. A waybill may thus be issued in San Juan for a shipment of goods from a port in South America to a port in the continental United States of which San Juan plays absolutely no part aside from being the locality where the waybill was issued. Likewise, a waybill may be issued in San Juan merely because it serves as a relay post for the transshipment of goods

---

**82.** We are mindful of the rule requiring avoidance of constitutional adjudication when a challenged legislation can be given a clearly permissible construction. *U. S. v. C. I. O.*, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948); *Schneider v. Smith*, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); *U. S. v. Rumely*, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953). However, the complete lack of guidelines of the 1974 and prior Acts, coupled with the intense and variegated interstate activity of plaintiffs within the municipalities, prevent us from embarking into what in this case would be a

"legislative" venture. We would be merely guessing the aspect of plaintiffs' activities whose exaction is intended. Compare with *State v. United States Express Co.*, 114 Minn. 346, 131 N.W. 489 (1911).

**83.** See plaintiffs' Exhibits 16, 17, 19 and 22.

**84.** The following charges would be subjected to the exaction as appear in the particular waybills: freight, documentation, "Virgin Islands beyond" charges and bunker surcharge. See Appendix A.

from the United States to Latin America or vice versa.

Under this method, there is a concomitant substantial risk that the activity so taxed be subjected to cumulative burdens.[85] Although such burdens have not actually been shown to exist at present, we cannot leave plaintiffs at the mercy of eventual exactions by the several jurisdictions in which they do business. This risk is augmented by the fact that a considerable part of such business is done with foreign countries, *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979),[86] and that Puerto Rico, because of its unique geographical location, serves as a relay station in a great deal of such trade.[87] Although *Complete Auto* "recognized that errors of apportionment that may lead to multiple burdens may be corrected when they occur", *Washington Rev. Dept. v. Stevedoring Ass'n,* 435 U.S. at 746, 98 S.Ct. at 1397, quoting from 430 U.S. at 288–289 n. 15, 97 S.Ct., at 1083–1084 n. 15, this assumes the existence of an apportionment method that establishes a "rational relationship" between plaintiffs' business within the municipalities and the income attributed by the ordinances or official interpretations thereof to each municipality. *Exxon Corp. v. Wisconsin Rev. Dept., supra.* In the absence of such a method, the present provisions cannot stand.

## IV

As a final argument, plaintiffs come to some length in order to persuade the Court that the municipal license taxes fall under the absolute ban of the Import—Export Clause, U.S.Const. Art. I, § 10, Cl. 2. See *Richfield Oil Corp. v. State Board,* 329 U.S. 69, 75, 67 S.Ct. 156, 159, 91 L.Ed. 80 (1946).

No matter how liberal we are in applying plaintiffs' reasoning to the facts of this case, we fail to see how the exactions at stake herein constitute "Imposts or Duties on Imports or Exports" as required by the clause. *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 290–94, 96 S.Ct. 535, 543–545, 46 L.Ed.2d 495 (1976). The tax does not offend the policy considerations announced in *Michelin.* Moreover, it does not fall on the goods carried by plaintiffs but on the freight and services accessorial thereto. *Canton R. Co. v. Rogan,* 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488 (1951). Finally, the fact that a tax affecting the freight may ostensively increase the price of the goods themselves is of no consequence, *Washington Rev. Dept. v. Stevedoring Assn., supra,* 435 U.S., at 751–764, 98 S.Ct. at 1399–1406. It is merely part of the "just share" that might permissibly increase the cost of business. *Western Live Stock v. Bureau, supra.* In view of our conclusion as to the Import—Export Clause, it is unnecessary to determine whether the same applies to Puerto Rico.

The foregoing constitute the Findings of Fact and Conclusions of Law required by F.R.Civ.P. 52.

Wherefore, this Court hereby rules that the assessment and collection of unapportioned municipal license taxes to plaintiffs by defendants herein as explained hereinabove violates the Commerce Clause of the

**85.** Plaintiffs pay both income and property tax to the Commonwealth of Puerto Rico. They concede that the formula used to determine their income tax returns, 13 LPRA 3119 and regulations thereunder, "apportions worldwide revenues and expenses without regard or consideration of where waybills or bills of lading were prepared", (Plaintiffs' Exhibit 53) and thus prevents duplicative taxation. Defendants have made no effort to adopt an analogous formula.

**86.** Plaintiffs do not purport to establish that they are "instrumentalities of foreign commerce" and thus fully under the rule of *Japan Line.* They argue, however, that the foreign commerce clause, as interpreted by said case, invests greater importance to the requisite of apportionability. We are in agreement with this reasoning.

**87.** This fact may carry additional consequences not examined herein. If the tax were found to fall on receipts from services wherein a particular municipality served solely as a relay station, additional analysis would be required so as to determine whether the exaction constituted a "duty of tonnage" expressly forbidden by U.S.Const. Art. I, § 10, Cl. 3. See *Packet Co. v. Keokuk,* 95 U.S. 80, 24 L.Ed. 377 (1877).

Constitution of the United States, U.S. Const. Art. I, § 8, Cl. 3.

## INJUNCTION

In view of the foregoing, defendants herein, the Municipalities of San Juan, Ponce, Mayaguez and Arecibo, their respective municipal assemblies, their agents, servants, attorneys and privies and all those in active concert or participation therewith are hereby permanently enjoined and restrained from assessing, levying, imposing or collecting the municipal license taxes established by the 1914, 1971 and 1974 Acts mentioned above and ordinances promulgated thereunder as presently drafted, to plaintiffs Sea-Land and Gulf in accordance with our Opinion and Order of this date, until and unless they are so imposed, levied, assessed or collected through an official apportionment formula or other method which complies with the requisites of the Commerce Clause expounded in this Opinion. Upon implementation of such an apportionment method, the taxes may be assessed and collected retrospectively to the periods for which returns have been filed by plaintiffs as long as collection thereof is not precluded by the statute of limitations, 21 LPRA 651r, 651s, 651t or is otherwise contrary to law. *Kentucky Union Co. v. Kentucky,* 219 U.S. 140, 31 S.Ct. 171, 55 L.Ed. 137 (1911); *Locke v. New Orleans,* 4 Wall (U.S.) 172, 18 L.Ed. 334 (1866).

The Clerk shall enter judgment accordingly.

SO ORDERED.

## APPENDIX "A"

### SEA–LAND SERVICE, INC.

Statement for the Puerto Rico Gross
Volume of Business Declaration

The following table presents the amount of outbound ocean (1) revenue for the years and locations shown as reflected by the books and records of Sea-Land Service, Inc.

| Calendar Year | Location | Amount |
|---|---|---|
| 1972 | Ponce | $1,620,168.50 |
| | Mayaguez | 1,935,903.96 |
| | Other – A | 8,528,430.06 |
| 1973 | Ponce | 2,070,790.51 |
| | Mayaguez | 2,313,435.93 |
| | St. Croix | 335,277.76 |
| | St. Thomas | 99,316.37 |
| | San Juan and Arecibo | 11,390,579.62 |

(1) Ocean revenue outbound is defined as including documentation fees and bunker fuel surcharges; excluding pickup and delivery charges, wharfage and Virgin Island beyond charges; and net of sales commissions paid.

A – Includes San Juan, Arecibo, St. Croix and St. Thomas

The following table presents a breakdown of Arecibo ocean revenue included in San Juan ocean revenue for the test periods shown:

| | 4 weeks ended | | |
|---|---|---|---|
| | 11/26/72 | 7/29/73 | 11/25/73 |
| Combined San Juan and Arecibo Ocean Revenue | $554,607.71 | $963,339.71 | $1,096,190.40 |
| Arecibo Ocean Revenue | 48,195.55 | 148,801.32 | 160,356.77 |

ERNST & ERNST
1400 BANCO POPULAR CENTER
HATO REY, PUERTO RICO 00918

APPENDIX "A" (Continued)

SEA–LAND SERVICE, INC.
STATEMENT OF ALLOCATION OF GROSS VOLUME OF BUSINESS
YEARS 1972 AND 1973

| | Percentage of Total | Allocated Vol. of Business | Allocated Sales Commission | Allocated Vol. of Business Including Sales Commission |
|---|---|---|---|---|
| **Volume of Business 1972:** | | | | |
| Ponce | 13.67% | 1,620,168.50 | 24,853.01 | 1,645,021.51 |
| Mayaguez | 15.17% | 1,935,903.96 | 27,580.11 | 1,963,484.07 |
| San Juan | 64.98% | 7,787,309.48 | 118,138.16 | 7,905,447.64 |
| Arecibo | 6.18% | 741,120.58 | 11,235.67 | 752,356.25 |
| Total | 100% | 12,084,502.52q | 181,806.95 | 12,266,309.47 |

Footnote (1)

Arecibo and San Juan percentage was broken down as per sample shown on page 2 of Ernst & Ernst certification for the year 1972. Percentages of sample obtained were as follows: (A) San Juan – 91.31% which represented 64.98% of the total (B) Arecibo – 8.6% which represented 6.18% of the total.

Footnote (2)

Ernst & Ernst certification excluded the amount of $181,806.95 which belongs to Sales commissions paid in 1972. This amount was allocated as shown above to the different municipalities.

| | Percentage of Total | Allocated Vol. of Business | Allocated Sales Commission | Allocated Vol. of Business Including Sales Commission |
|---|---|---|---|---|
| **Volume of Business 1973:** | | | | |
| Ponce | 12.77% | 2,070,790.51 | 35,924.59 | 2,106,715.10 |
| Mayaguez | 14.27% | 2,313,435.93 | 39,934.03 | 2,353,369.96 |
| San Juan | 59.73% | 9,681,992.67 | 161,473.54 | 9,843,466.21 |
| Arecibo | 10.54% | 1,708,586.95 | 29,963.89 | 1,738,550.84 |
| St. Croix | 2.07% | 335,277.76 | – | 335,277.76 |
| St. Thomas | .62% | 99,316.37 | – | 99,316.37 |
| Total | 100% | 16,209,400.19 | 267,296.05 | 16,476,896.24 |

Footnote (3)

Arecibo and San Juan percentage was broken down as per sample shown on page 2 of Ernst and Ernst certification for the year 1973. Percentages of sample obtained were as follows: (A) San Juan 85% which represented 59.73% of the total; Arecibo 15% which represented 10.54% of the total.

Footnote (4)

Ernst & Ernst certification excluded the amount of $267,296.05 which belongs to sales commissions paid in 1973. This amount was allocated as follows to the different municipalities: Ponce 13.44%; Mayaguez 14.94%; San Juan 60.41% and Arecibo 11.21% (St. Croix and St. Thomas were excluded).